IN THE SUPREME COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE VIKING PUMP, INC. AND WARREN PUMPS, LLC INSURANCE APPEALS | § § § § § § § § § § § § § § § § § | No. 518, 2014 No. 523, 2014 No. 525, 2014 No. 528, 2014  CASES BELOW:  Superior Court of the State of Delaware Consolidated C. A. No. N10C-06-141  -and-  Court of Chancery of the State of Delaware C.A. No. 1465-VCS |

Submitted: July 13, 2016
Decided: September 12, 2016

Before **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices; **WALLS** and **RYAN**, Judges,[*] constituting the Court *en Banc*.

Upon appeals from the Superior Court and the Court of Chancery: **AFFIRMED in part and REVERSED in part**.

David J. Baldwin, Esquire, Jennifer C. Wasson, Esquire, Michael B. Rush, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware. Of Counsel: Robin L. Cohen, Esquire (*Argued*), Keith McKenna, Esquire, McKool Smith, New York, New York, for Appellant *Warren Pumps LLC*.

Paul Cottrell, Esquire, Tighe & Cottrell, P.A., Wilmington, Delaware. Of Counsel: Laura S. McKay, Esquire, Hinkhouse Williams Walsh LLP, Chicago, Illinois; AND Anthony G. Flynn, Esquire, Timothy Jay Houseal, Esquire, Jennifer M. Kinkus, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware. Of Counsel: Lynn H. Murray, Esquire (*Argued*), Shook, Hardy & Bacon LLP, *Attorneys for The Continental Insurance Company as successor by merger to Fidelity & Casualty Company of New York.*

---

[*] Sitting by designation pursuant to Del. Const. art. IV § 12.

Lisa A. Schmidt, Esquire, Travis S. Hunter, Esquire, Richards, Layton & Finger, P.A., Wilmington, Delaware. Of Counsel: Michael P. Foradas, Esquire (*Argued*), Lisa G. Esayian, Esquire, William T. Pruitt, Esquire, Kirkland & Ellis LLP, Chicago, Illinois, for Appellant *Viking Pump, Inc.*

Kenneth J. Nachbar, Esquire (*Argued*), Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware AND Garrett B. Moritz, Esquire and Nicholas D. Mozal, Esquire, Ross Aronstam & Moritz LLP, Wilmington, Delaware. Of Counsel: Tancred Schiavoni, Esquire and Gary Svirsky, Esquire, O'Melveny & Myers LLP, New York, New York; AND John D. Balaguer, Esquire, White and Williams LLP, Wilmington, Delaware. Of Counsel: Brian G. Fox, Esquire and Lawrence A. Nathanson, Esquire, Siegal & Park, Mount Laurel, New Jersey, *Attorneys for Defendants TIG Insurance Company, f/k/a International Insurance Company, with respect to policies numbered 5220113076 and 5220282357, and Westchester Fire Insurance Company, with respect to policy numbered 5220489339, by operation of novation; ACE Property & Casualty Insurance Company (f/k/a CIGNA Property & Casualty Insurance Company), as successor-in-interest to Central National Insurance Company of Omaha, but only as respects policies issued through Cravens, Dargan & Company, Pacific Coast (improperly named as The Central National Insurance Company of Omaha); and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America and Century Indemnity Company as successor to CIGNA Specialty Insurance Company (f/k/a California Union Insurance Company).*

Paul Cottrell, Esquire, Tighe & Cottrell, P.A., Wilmington, Delaware. Of Counsel: Laura S. McKay, Esquire, Hinkhouse Williams Walsh LLP, Chicago, Illinois; AND Anthony G. Flynn, Esquire, Timothy Jay Houseal, Esquire, Jennifer M. Kinkus, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, *Attorneys for Certain Underwriters at Lloyd's, London and certain London Market Insurance Companies, Granite State Insurance Company, Lexington Insurance Company And National Union Fire Insurance Company of Pittsburgh, PA.*

Robert J. Katzenstein, Esquire, Smith Katzenstein & Jenkins LLP, Wilmington, Delaware. Of Counsel: Christopher R. Carroll, Esquire, Heather E. Simpson, Esquire, Carroll McNulty & Kull LLC, Basking Ridge, New Jersey, *Attorneys for TIG Insurance Company, as successor by merger to International Insurance Company, as successor by merger to International Surplus Lines Insurance Company (Policy No. XSI 5217 only).*

Thaddeus J. Weaver, Esquire, Dilworth Paxson LLP, Wilmington, Delaware. Of Counsel: Laura S. McKay, Esquire, Douglas M. DeWitt, Esquire, Hinkhouse Williams Walsh LLP, Chicago, Illinois; AND Anthony G. Flynn, Esquire, Timothy Jay Houseal, Esquire, Jennifer M. Kinkus, Esquire, Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware, *Attorneys for OneBeacon America Insurance Company as successor to Commercial Union Insurance Company, XL Insurance America, Inc., as*

2

*successor to Vanguard Insurance Company, and Republic Insurance Company, n/k/a Starr Indemnity & Liability Company.*

James W. Semple, Esquire, Cooch & Taylor P.A., Wilmington, Delaware.  Of Counsel: Kristin Suga Heres, Esquire, Zelle LLP, Framingham, Massachusetts, *Attorneys for Defendant Westport Insurance Corporation.*

Robert M. Greenberg, Esquire, Tybout Redfearn & Pell, Wilmington, Delaware.  Of Counsel:  Amy R. Paulus, Esquire, Mark D. Paulson, Esquire and Don R. Sampen, Esquire, Clausen Miller P.C., Chicago, Illinois, *Attorneys for Old Republic Insurance Company.*

Neal J. Levitsky, Esquire, Seth A. Niederman, Esquire, Fox Rothschild LLP, Wilmington, Delaware.  Of Counsel:  Kathleen D. Monnes, Esquire, Joseph K. Scully, Esquire and John W. Cerreta, Esquire, Day Pitney LLP, Hartford, Connecticut, *Attorneys for Defendant, Travelers Casualty and Surety Company f/k/a The Aetna Casualty and Surety Company.*

**VALIHURA**, Justice:

This is a consolidated appeal in an insurance-coverage dispute from separate judgments by the Court of Chancery and the Superior Court. Viking Pump, Inc. ("Viking") and Warren Pumps, LLC ("Warren") seek to recover under insurance policies issued to a third company, Houdaille Industries, Inc. ("Houdaille"). In the 1980's, Viking and Warren acquired pump manufacturing businesses from Houdaille. As a result, Viking and Warren have been confronted with potential liability flowing from personal injury claims made by plaintiffs alleging damages in connection with asbestos exposure claims dating back to when the pump manufacturing businesses were owned by Houdaille (the "Houdaille-Era Claims"). Each year from 1972 through 1985, Houdaille purchased occurrence-based primary and umbrella insurance from Liberty Mutual Insurance Company ("Liberty"). Above the Liberty umbrella layer, Houdaille purchased layers of excess insurance. In total, Houdaille purchased 35 excess policies through 20 different carriers (the "Excess Policies"). Houdaille's 14-year insurance tower offered $17.5 million in primary coverage, $42 million in umbrella coverage, and $427.5 million in excess coverage.

Viking and Warren now seek to fund the liabilities arising from the Houdaille-Era Claims using the comprehensive insurance program originally purchased by Houdaille. The insurance companies that issued the Excess Policies (the "Excess Insurers") contend that Viking and Warren are not entitled to use the Excess Policies to respond to the Houdaille-Era Claims. The Excess Insurers also dispute the extent of any coverage available, particularly with respect to defense costs.

4

# I.    FACTUAL AND PROCEDURAL BACKGROUND

A more detailed history of this litigation can be gleaned from several other significant opinions.[1]

## A.    *The Court of Chancery Proceedings*

This litigation first arose in 2005, when Viking brought suit in the Court of Chancery claiming that it was the successor to insurance policies that Liberty had issued to Houdaille or, in the alternative, seeking partition of the Liberty policy limits.  Liberty, Viking, and Warren settled that dispute.

Viking and Warren then filed new complaints in the Court of Chancery against more than twenty other insurers that had issued excess policies to Houdaille.  The parties cross-moved for summary judgment on how to allocate the losses where the underlying asbestos injuries potentially trigger coverage against multiple policy periods.[2]

With regard to allocation, the Court of Chancery considered the "*pro rata*" and "all sums" approaches and observed that New York law, which governs interpretation of the policies, did not impose either approach on all insurance contracts.  Rather, New York precedent required that the court "apply traditional principles of insurance contract interpretation to the policies at issue and then apply the approach that results from that

---

[1] *See In re Viking Pump, Inc.,* 52 N.E.3d 1144 (N.Y. 2016) [hereinafter, "*Viking Pump V*, 52 N.E.3d at __"]; *Viking Pump, Inc. v. Century Indem. Co.*, 2014 WL 1305003 (Del. Super. Feb. 28, 2014) [hereinafter, "*Viking Pump IV*, 2014 WL 1305003 at __"]; *Viking Pump, Inc. v. Century Indem. Co.*, 2013 WL 7098824 (Del. Super. Oct. 31, 2013) [hereinafter, "*Viking Pump III*, 2013 WL 7098824 at __"]; *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76 (Del. Ch. 2009) [hereinafter, "*Viking Pump II*, 2 A.3d at __"]; *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107 (Del. Ch. Apr. 2, 2007) [hereinafter, "*Viking Pump I*, 2007 WL 1207107 at __"].
[2] *Viking Pump II*, 2 A.3d 76.

interpretative exercise."[3]  Thus, under New York law, the method of allocation depended upon the language of the policy,[4] and the Court of Chancery held that the Houdaille policies "unambiguously provide for all sums allocation."[5]  In so holding, the Court of Chancery distinguished a leading New York case on the issue, *Consolidated Edison Company of New York, Inc. v. Allstate Insurance Company*,[6] on the ground that the policies in this dispute contain additional provisions—namely, the "Non-Cumulation" and "Prior Insurance" provisions—that the court viewed as inconsistent with *pro rata* allocation.[7]

## B.  *The Superior Court Proceedings*

Following the Court of Chancery proceedings, the case was transferred to the Superior Court on June 11, 2010 to hear and determine several other issues, one of which was whether the Excess Policies were subject to vertical or horizontal exhaustion.  The Superior Court held a three week trial in October and November 2012.  The jury verdict was predominately in Warren and Viking's favor.[8]  Warren and Viking sought a judgment incorporating the verdict, and the defendants sought a judgment notwithstanding the verdict.

---

[3] *Id.* at 107-08.

[4] *See Raymond Corp. v. Nat'l Union Fire Ins. Co.*, 5 N.Y.3d 157, 162 (N.Y. 2005) ("In determining a dispute over insurance coverage, we first look to the language of the policy." (citations omitted)).

[5] *Viking Pump II*, 2 A.3d at 119.

[6] 774 N.E.2d 687 (N.Y. 2002).

[7] *Viking Pump II*, 2 A.3d at 118-27.

[8] The Superior Court commented that "[t]he evidence was substantial and, for the most part, supports the jury's verdict.  . . . But, reading each policy closely and without extrinsic evidence, the verdict must be refined to conform to the policies' unambiguous meaning."  *Viking Pump III*, 2013 WL 7098824, at *16.

In a post-trial Opinion dated October 31, 2013, on Plaintiffs' Motion for Final Judgment and Defendants' Renewed Motion for Judgment as a Matter of Law, the Superior Court held that, as a matter of New York law, Viking and Warren were obligated to horizontally exhaust all triggered "primary and umbrella insurance layers before tapping" into any of Houdaille's excess coverage.[9] In a subsequent Opinion dated February 28, 2014, the Superior Court clarified that this horizontal-exhaustion requirement was limited to the primary and umbrella coverage layers and not the excess coverage.[10]

On June 9, 2014, the Superior Court entered a Final Judgment Order After Trial.[11] Warren moved to clarify and amend the judgment, which motion the Superior Court denied on August 20, 2014. All parties appealed, and this Court heard oral arguments. Following oral argument, because resolution of this appeal depended upon significant and unsettled questions of New York law that had yet to be answered in the first instance by the New York Court of Appeals, this Court advised the parties that it had decided to certify two questions to the New York Court of Appeals.

### C.  *Certified Questions to the New York Court of Appeals*

This Court certified the following questions to the New York Court of Appeals:

1.  Under New York law, is the proper method of allocation to be used all sums or *pro rata* when there are non-cumulation and prior insurance provisions?

---

[9] *Id.* at *21.
[10] *Viking Pump IV*, 2014 WL 1305003, at *11-12.
[11] Final Judgment Order After Trial, *Viking Pump, Inc. v. Century Indem. Co.*, No. N10C-06-141 FSS (Del. Super. June 9, 2014) [hereinafter Final Judgment at JA____], *available at* JA1862-75.

7

2.      Given the Court's answer to Question #1, under New York law and based on the policy language at issue here, when the underlying primary and umbrella insurance in the same policy period has been exhausted, does vertical or horizontal exhaustion apply to determine when a policyholder may access its excess insurance?[12]

In an Opinion, dated May 3, 2016, the New York Court of Appeals answered the foregoing certified questions of law.[13] The Court held that "based on the policy language and the persuasive authority holding that *pro rata* allocation is inconsistent with non-cumulation and non-cumulation/prior insurance provisions, we hold that all sums allocation is appropriate in policies containing such provisions, like the ones at issue here."[14] The New York Court of Appeals also concluded that the Excess Policies "are triggered by vertical exhaustion of the underlying available coverage within the same policy period."[15]

## D.    *The Litigation Resumes in Delaware*

---

[12] *In re Viking Pump, Inc.*, 2015 WL 3618924, at *3 (Del. June 10, 2015).

[13] *See Viking Pump V*, 52 N.E.3d 1144.

[14] *Id.* at 1156. The New York Court of Appeals determined that "[t]he policy language at issue here, by inclusion of the non-cumulation clauses and the two-part non-cumulation and prior insurance provisions, is substantively distinguishable from the language" at issue in *Consolidated Edison*. *Id.* at 1152. In fact, the Court found that "the excess policies before us here present the very type of language that [the Court] signaled might compel all sums allocation in *Consolidated Edison*." *Id.* Contemplating "whether the presence of a non-cumulation clause or a non-cumulation and prior insurance provision mandates all sums allocation" (*Id.* at 1152), the New York Court of Appeals concluded "that it would be inconsistent with the language of the non-cumulation clauses to use *pro rata* allocation here." *Id.* at 1153.

[15] *Id.* at 1157-58 (citing *United States Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 985 N.E.2d 876, 888 (N.Y. 2013)) (citation omitted). The Court reasoned that "[a]ll of the excess policies at issue primarily hinge their attachment on the exhaustion of underlying policies that cover the same policy period as the overlying excess policy, and that are specifically identified by either name, policy number, or policy limit." *Id.* at 1156. It also observed that "vertical exhaustion is conceptually consistent with an all sums allocation, permitting the [i]nsured to seek coverage through the layers of insurance available for a specific year." *Id.*

8

With these critical questions helpfully answered by our sister Court, this Court, by letter, dated May 11, 2016, ordered the parties to file a stipulation of remaining legal issues. On June 3, 2016, the parties filed a Joint Stipulation Setting Forth Remaining Legal Issues on Appeal (the "Joint Stipulation"). The Joint Stipulation identified five principal issues to be resolved by this Court:

(i)     Whether the Court of Chancery erred in ruling that Warren and Viking obtained valid assignments of insurance rights;

(ii)    Whether the Superior Court erred in ruling that the aggregate product liability limits of the 1980-1985 Liberty Mutual Insurance Company primary insurance policies are exhausted;

(iii)    Whether the Superior Court erred in ruling that 33 of the 34 excess policies that are at issue in this case provide coverage for Warren and Viking's costs of defending the underlying asbestos claims;

(iv)    Whether the Superior Court erred in ruling that defense cost payments under sixteen of the excess policies at issue in this case count toward the reduction of the policy limits of liability; and

(v)    Whether the Superior Court erred in holding that only those policies in place during a claimant's significant exposure to asbestos were triggered.

We address each of the issues below, combining the discussion of the third and fourth issues on defense costs to avoid repetition.

## II.    ANALYSIS

### A.  *The Court of Chancery Correctly Held That There Were Valid Assignments*

### 1.    Contentions of the Parties

On appeal, Travelers Casualty and Surety Company ("Travelers") advances two principal arguments to support its claim that the Court of Chancery erred in concluding

that Houdaille had validly assigned the insurance coverage rights under the Excess Policies to Viking and Warren.[16] *First*, Travelers contends that the assignments to Viking and Warren are invalid because the Excess Insurers did not consent to the assignments. *Second*, it asserts that certain transaction agreements failed to effect any assignment of the Excess Policies to Viking or Warren.

Viking and Warren both argue that the Court of Chancery properly held that they maintain the rights of an insured under the Excess Policies. That is, both urge that Houdaille validly assigned the insurance coverage rights under the Excess Policies to them. We agree and affirm the decision of the Court of Chancery.

## 2. Standard of Review

We review a trial court's grant of summary judgment *de novo*.[17] We also review questions of contract interpretation *de novo*.[18]

## 3. Discussion

### i. *Houdaille Validly Assigned Coverage Under the Excess Policies to Warren*

Houdaille was an industrial conglomerate that dissolved in 1989. During its existence, it operated a variety of distinct businesses, either as unincorporated divisions or through wholly-owned subsidiaries. Both Warren and Viking were initially independent companies that were acquired by Houdaille. In 1985, Houdaille divested

---

[16] In a footnote, the Excess Insurers join the arguments raised by Travelers with respect to the validity of the assignment of insurance coverage rights under the Excess Policies. *See* Excess Insurers' Op. Br. 49 n.16.

[17] *Moses v. Drake*, 109 A.3d 562, 565 (Del. 2015) (citation omitted).

[18] *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014).

itself of all of its assets, including both the Warren Pumps and Viking Pump businesses.[19] The Viking Pump unit operated as a division within Houdaille until 1985. The Warren Pumps unit was originally acquired in 1972 through a stock purchase transaction and later merged into Houdaille. From that point until December 1984, Warren Pumps operated as an unincorporated division within Houdaille.

In December 1984, Houdaille transferred the Warren Pumps business to a wholly-owned subsidiary, Warren Pumps-Houdaille, Inc. ("WPH"). Shortly thereafter, a management group proposed to purchase the Warren Pumps business. Houdaille and WPH agreed to sell the Warren Pumps business to Warren.[20] Houdaille, WPH, and Warren entered into the 1985 Asset Sale Agreement by which Warren acquired the Warren Pumps business (the "Warren ASA"). Through the Warren ASA, Warren agreed to be liable for all of the as-yet-unasserted Houdaille-Era Claims arising out of the Warren Pumps business. The Warren ASA provided:

> 2.10 Insurance. . . . [A]s of the commencement of business on the day of the Closing and thereafter, [Warren] agrees that [Warren] shall be responsible and liable for all workers' compensation claims, general liability (including, without limitation, product liability) claims and automotive liability claims on a claims made basis for which [WPH] directly or through any [p]redecessor is responsible [other than certain claims that are asserted prior to the Warren ASA's closing.][21]

---

[19] At relevant times, Warren Pumps and Viking Pump were operated through various legal entities. For ease of reference, we use the generic labels "Warren Pumps" and "Viking Pump" to refer the actual businesses.

[20] At the time, Warren was a corporation, W.P., Inc. Accordingly, Warren's predecessor corporation was a party to the asset sale transaction.

[21] App'x to Travelers Op. Br. 791-92 [hereinafter "TA___"].

The Warren ASA, as initially drafted, did not grant Warren rights to Houdaille's or WPH's insurance coverage. However, as a condition to closing, Warren was obligated to obtain $25 million in claims-made insurance.

Warren was unable to obtain the coverage required by the Warren ASA in advance of closing. On August 30, 1985, Warren, WPH, and Houdaille amended the Warren ASA (the "Warren ASA Amendment") in order to afford Warren the right to access the insurance coverage related to the Houdaille-Era Claims. The Warren ASA Amendment provided that Warren need only obtain $1 million in general liability insurance. The Amendment further provided:

> [Warren], [WPH] and Houdaille acknowledge that [WPH] and Houdaille have permitted [Warren] to utilize the insurance coverage in excess of the primary casualty limits identified above, which [WPH] and Houdaille have in effect, for claims made pertaining to occurrences prior to the date of the [c]losing, but only to the extent that such insurance coverage is in fact available.[22]

After executing the Warren ASA Amendment, Warren, WPH, and Houdaille closed on the Warren ASA. Warren assumed the Warren Pumps business.

Relying upon extrinsic evidence, Travelers contends that the parties to the instrument failed to manifest any intent to assign rights to the excess policies. Specifically, Travelers urges that the unamended portions of the Warren ASA and the "overall context" of the *original* Warren ASA indicate that Houdaille was not attempting to effect any assignment of rights to the Excess Policies through the instrument. Further,

---

[22] TA969-70.

12

it asserts that the Warren ASA Amendment was intended only as a transfer of rights to the Liberty umbrella policies.

Despite Travelers' argument to the contrary, the contractual language of the Warren ASA Amendment is unambiguous. Under New York law, which governs the Warren ASA,[23] "[e]xtrinsic evidence of the parties' intent may be considered *only* if the agreement is ambiguous, which is an issue of law for the courts to decide."[24] "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[25]

As initially drafted, the Warren ASA did not assign Warren coverage under the Excess Policies. But the Warren ASA Amendment did. The Amendment assigned "the insurance coverage *in excess of* the primary casualty limits."[26] As the Court of Chancery observed, "[t]he Excess Policies were unquestionably coverage 'in excess of the primary casualty limits.'"[27] Moreover, the Warren ASA Amendment contains no language that indicates that Houdaille and Warren intended that the assignment be limited to the Liberty umbrella policies. Rather, the ASA Amendment, on its face, is reasonably susceptible of only one meaning: it assigned coverage under the Excess Policies to Warren. Because the meaning of "the insurance coverage in excess of the primary

---

[23] The Warren ASA is governed by the "laws of the State of New York." TA865.

[24] *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)) (emphasis added).

[25] *Selective Ins. Co. of Am. v. Cnty. of Rensselaer*, 47 N.E.3d 458, 461 (N.Y. 2016) (quoting *Greenfield*, 780 N.E.2d at 170-71) (alteration in *Selective Ins.*).

[26] TA969 (emphasis added).

[27] *Viking Pump II*, 2 A.3d at 94.

casualty limits" is clear, extrinsic evidence may not be considered under New York law.[28]

Accordingly, we conclude that the Court of Chancery did not err in concluding that Houdaille validly assigned coverage under the Excess Policies to Warren.

ii. *Houdaille Validly Assigned Coverage Under the Excess Policies to Viking in the 1985 Assignment and Assumption Agreement*

Pursuant to an Assignment and Assumption Agreement, dated January 31, 1985, the Viking Pump business was assigned to Viking (the "Viking AAA").[29] Viking was, at that time, operated as a wholly-owned subsidiary of Houdaille. The Viking AAA assigned Viking Pump assets—and their related liabilities—to Viking. Specifically, under the Viking AAA, Viking was assigned "all of the right, title and interest of [Houdaille] in and to all of the properties and assets of [Houdaille] (whether tangible or intangible, real or personal) required for the conduct of the business of [Viking Pump] . . . ." [30] Included among such properties and assets of Houdaille were, "without limitation, . . . [all] arrangements or understandings of whatsoever nature, whether oral or written . . . ."[31] Viking also agreed to assume "[a]ll obligations and liabilities for which [Viking Pump] . . . or any other [p]redecessor" was responsible under such arrangements and understandings.[32]

---

[28] *See W.W.W. Assocs.*, 566 N.E.2d at 642 ("A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." (citations omitted)).

[29] TA1036-40.

[30] TA1036.

[31] TA1036.

[32] TA1038.

Through the Viking AAA, Viking explicitly "assume[d] and agree[d] to pay or otherwise perform when due all of the obligations and liabilities, directly or indirectly, of [Viking Pump] . . . ."[33]  Plainly, this provision of the Viking AAA transferred all of the obligations and liabilities of Viking Pump to Viking.  Among the liabilities transferred to Viking were "all of the obligations and liabilities, directly or indirectly, of [Viking Pump] or the business in whole or in part thereof or any [p]redecessor . . . or the business in whole or in part thereof, of whatsoever nature . . . ."[34]  The Viking AAA also provided that Viking was assigned "[a]ll liabilities and obligations whether known or unknown of the type covered by . . . general liability (including, without limitation, product liability) insurance . . . of [Viking Pump.]"[35]

Under Florida law, which governs the Viking AAA,[36] "[w]hen interpreting a contract, the court must first examine the plain language of the contract for evidence of the parties' intent."[37]  "The intention of the parties must be determined from an examination of the whole contract and not from the separate phrases or paragraphs."[38] "In reviewing the contract in an attempt to determine its true meaning, the court must review the entire contract without fragmenting any segment or portion."[39]  Further, where

---

[33] TA1037.

[34] TA1037.

[35] TA1039.

[36] The Viking AAA is governed by "the laws of the State of Florida."  TA1040.

[37] *Hatadis v. Achieva Credit Union*, 159 So. 3d 256, 259 (Fla. Dist. Ct. App. 2015) (citation omitted) (internal quotation marks omitted).

[38] *Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. Dist. Ct. App. 2007) (quoting *Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958)) (internal quotation marks omitted).

[39] *Id.* (quoting *J.C. Penney Co. v. Koff*, 345 So. 2d 732, 735 (Fla. Dist. Ct. App. 1977)) (internal quotation marks omitted).

a contract is unambiguous on its face, the parol evidence rule bars the introduction of extrinsic evidence.[40]   A word or phrase is ambiguous, permitting the consideration of extrinsic evidence, "only when it is of uncertain meaning, and may be fairly understood in more ways than one."[41]

The Viking AAA employed broad contractual language to transfer to Viking all of the properties and assets of Houdaille necessary for the conduct of the business of Viking Pump.   The instrument transfers to Viking all of the tangible *and* intangible assets required for the operation of Viking Pump, and it does so without limitation.   That is, under the Viking AAA, Houdaille transferred to Viking "all of the right, title and interest" of Houdaille in the contracts necessary for Viking to operate the Viking Pump business.[42]   As the sweeping language of the Viking AAA makes readily apparent, Houdaille and its then–wholly owned subsidiary, Viking, entered into the agreement with the intention that Viking assume all right, title, and interest in the contracts, arrangements, and understandings necessary to operate Viking Pump.

Travelers argues that the Viking AAA failed to identify the Excess Policies as among the rights to be transferred.   In view of the unambiguous contractual terms assigning to Viking all of the right, title, and interest of Houdaille in "all outstanding contracts" necessary for the operation of the Viking Pump business, Travelers' argument is unpersuasive.   The Viking AAA manifests Houdaille's intent to assign all right, title, and interest in such contracts and an intention by Viking to receive the same for valuable

---

[40] *See Olive v. Tampa Educ. Cable Consortium*, 723 So. 2d 883, 884 (Fla. Dist. Ct. App. 1998).
[41] *Friedman v. Va. Metal Prods. Corp.*, 56 So. 2d 515, 517 (Fla. 1952) (citation omitted).
[42] TA1036.

16

consideration. That the Viking AAA did not specifically identify the Excess Policies does not undermine the comprehensive contractual language utilized to effect the asset transfer. Nor does Florida law require the level of specificity that Travelers seeks.[43] Accordingly, considering the agreement as a whole, the Viking AAA reflects a comprehensive transfer of all of the assets, including rights to insurance coverage, required for the operation of the Viking Pump business.

iii.  *In Light of the 1988 Stock Purchase Agreement, Viking Maintained Coverage Under the Excess Policies*

After executing the Viking AAA, Houdaille continued to operate Viking Pump as a wholly-owned subsidiary for the next three years. In January 1988, Houdaille sold all of the outstanding shares of Viking to IDEX Corporation ("IDEX") through a Stock Purchase Agreement (the "Viking Stock Agreement"). In addition to the shares of Viking, IDEX purchased the stock of five other Houdaille subsidiaries (collectively with Viking, the "Sold Subsidiaries"). In exchange for Viking and the other subsidiaries, Houdaille received $190 million and 20,000 shares of stock in IDEX.

---

[43] The principal case relied upon by Travelers states that Florida law requires "[n]o particular words or form of instrument is necessary to effect an equitable assignment and any language, however informal, which shows an intention on one side to assign a right . . . and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment." *See SourceTrack, LLC v. Ariba, Inc.*, 958 So. 2d 523, 526 (Fla. Dist. Ct. App. 2007) (quoting *Giles v. Sun Bank, N.A.*, 450 So. 2d 258, 260 (Fla. Dist. Ct. App. 1984)) (internal quotation marks omitted) (alteration in original and added); *see also* 29 WILLISTON ON CONTRACTS § 74:3 (4th ed. 2016) ("No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient . . . ." (citations omitted)); RESTATEMENT (SECOND) OF CONTRACTS ch. 15, topic 2, § 324, cmt. a (1981) ("Assignment requires an assignable right. Aside from statute, the assignor of such a right may make an assignment by manifestation of intention without any particular formality." (internal citations omitted)).

17

The Viking Stock Agreement does not make reference to Viking's or any other subsidiary's right to insurance coverage. However, Section 5.12 of the instrument provides:

> 5.12 <u>Allocation of Certain Liabilities</u>. Upon the Closing, [IDEX] will as a result of such transaction assume only those liabilities that pertain to the [Sold Subsidiaries], including, but not limited to, those liabilities set out on Schedule B hereto, and [IDEX] shall release, indemnify and hold Houdaille harmless from all such liabilities; <u>provided</u>, <u>however</u>, that *Houdaille shall remain liable to the extent of insurance coverage available (in the event of claims arising from occurrences prior to the Closing Date, only to the extent such coverage is available on an occurrence basis) under existing or previously existing casualty insurance policies (including workmen's compensation) and only if* [*IDEX*] *reimburses Houdaille for the deductible, if any, applicable to any such claim for which coverage is claimed.*[44]

As the Court of Chancery observed, Section 5.12 of the Viking Stock Agreement is complicated by the reality that, in 1985, Houdaille had already transferred the Houdaille-Era Claims and the associated insurance rights to Viking through the Viking AAA.

Under Delaware law, which governs the Viking Stock Agreement,[45] courts interpreting a contract "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[46] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[47] When there is

---

[44] TA1065-66 (underline in original) (italics added).

[45] The Viking Stock Agreement is "governed by the laws of the State of Delaware[.]" TA1060.

[46] *Salamone*, 106 A.3d at 368 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012)) (internal quotation marks omitted).

[47] *GMG Capital Invs.*, 36 A.3d at 780 (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)) (internal quotation marks omitted).

18

ambiguity flowing from contractual language, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[48] When construing ambiguous contractual provisions, Delaware courts are permitted to consider the parties' course of dealing.[49]

Viking was not a party to the Viking Stock Agreement. Nothing in the Stock Agreement purports to transfer to Houdaille any rights or liabilities belonging to Viking. In particular, Section 5.12 allocates liabilities between IDEX and Houdaille—not Viking. Nor does Section 5.12 contemplate divesting Viking of the rights and liabilities it had agreed to assume via the 1985 Viking AAA.

In addressing the perceived ambiguity, the Court of Chancery properly considered the course of performance following the closing of the Viking Stock Agreement. The court concluded that, "for a generation [Viking] has acted as if it was responsible for the Houdaille-Era Claims."[50] It found that, "everyone who was a party to the Viking Stock Agreement has acted as if [Viking] retained both liability for the Houdaille-Era Claims and the Insurance Rights," and that "those parties even did so when these issues were against their own interests."[51]

Travelers suggests that an internal Houdaille memorandum, dated October 16, 1987, demonstrates the intent underlying the Viking Stock Agreement. The memorandum provides: "Existing claims and claims <u>for occurrences prior to the date of</u>

---

[48] *Eagle Indus.*, 702 A.2d at 1232 (citations omitted).
[49] *Id.* at 1233.
[50] *Viking Pump II*, 2 A.3d at 101.
[51] *Id.* at 102.

closing (but yet to be reported) <u>will be the responsibility of Houdaille</u> and would be covered under the previously purchased Houdaille insurance policies."[52] That is, the memorandum contemplates that, after the sale of Viking and other subsidiaries, Houdaille would remain liable for occurrences preceding the closing date, including the Houdaille-Era Claims. But the 1987 memorandum fails to address, in view of the 1985 Viking AAA, the fact that the liability and insurance rights related to the Houdaille-Era Claims had been assigned previously to Viking. In short, it clarifies little. Moreover, the record evidence does not indicate that the internal Houdaille memorandum was shared with, or approved by, IDEX.

As Travelers concedes, the Viking Stock Agreement does not manifest any intention of Viking, Houdaille, or IDEX to re-assign the assets and liabilities that were assumed by Viking in 1985. However, the Viking AAA reflects a comprehensive transfer from Houdaille to Viking of *all* of the liabilities and assets, including rights to insurance coverage, pertaining to the Viking Pump business. The Viking Stock Agreement and the extrinsic evidence related thereto did not address the Viking AAA, let alone undo its valid, unambiguous, and broad transfer of all of the right, title, and interest of Houdaille in and to all of the assets of Houdaille required for the conduct of the business of Viking Pump.

iv. *The Anti-Assignment Provisions Do Not Preclude Transfer of Post-Loss Claims*

On appeal, the principal argument raised by the Excess Insurers with respect to the validity of the assignments made to Warren and Viking is that, under the relevant

---

[52] TA1074 (emphasis in original).

insurance policies, the insured's failure to obtain the consent of the insurer in advance of assigning coverage rights invalidates the efficacy of the transfer. Both Warren and Viking disagree, urging that the anti-assignment provisions do not bar the assignment of insurance rights for pre-assignment occurrences.[53] The primary liability, umbrella, and

---

[53] The Excess Insurers have relied upon the California Supreme Court's decision *Henkel Corporation v. Hartford Accident & Indemnity Company*, 62 P.3d 69 (Cal. 2003), as the foundation for their argument that the anti-assignment provisions in the Houdaille insurance policies vitiate Houdaille's assignments to Warren and Viking of insurance rights for pre-assignment occurrences. The Court of Chancery found that "New York law on this matter is in accord with the dissent in *Henkel*, which stressed that anti-assignment clauses should not apply in this context because '[t]he risk insured against does not increase because the insurer's duty to defend and indemnify relates to an injury or damage which was suffered by the claimant *prior* to the assignment of benefits to a successor corporation.'" *Viking Pump II*, 2 A.3d at 105 (quoting *Henkel*, 62 P.3d at 79 (Moreno, J., dissenting)) (emphasis in *Henkel*).

In *Henkel*, the California Supreme Court held that consent-to-assignment clauses preclude an insured's transfer of the right to invoke coverage without the insurer's consent, even *after* the coverage-triggering event had already occurred. It concluded that such attempted assignments would be ineffective until the underlying claims "bec[a]me an assignable chose in action" by being "reduced to a sum of money due or to become due under the policy." *Henkel*, 62 P.3d at 75.

Based upon California Insurance Code § 520, the California Supreme Court, in *Fluor Corp. v. Superior Court of Orange County*, overruled *Henkel*, holding that "after personal injury (or property damage) resulting in loss occurs within the time limits of the policy, an insurer is precluded from refusing to honor an insured's assignment of the right to invoke defense or indemnification coverage regarding that loss." *Fluor Corp. v. Superior Court of Orange Cnty.*, 354 P.3d 302, 334 (Cal. 2015). The California Supreme Court observed that "[t]his result obtains *even without consent by the insurer*—and even though the dollar amount of the loss *remains unknown or undetermined* until established later by a judgment or approved settlement." *Id.* (emphasis added). The court in *Henkel* had not considered Section 520. In *Fluor*, the court held that Section 520 "dictates a result different from that reached in *Henkel*." *Id.* at 304. The *Fluor* court noted that "[S]ection 520 bars an insurer, 'after a loss has happened,' from refusing to honor an insured's assignment of the right to invoke the insurance policy's coverage for such a loss." *Id.* (quoting CAL. INS. CODE § 520 (West)). The court further observed that "the rule embodied in Section 520 is consistent with the overwhelming majority of cases decided before and since *Henkel*." *Id.*

On August 26, 2015, this Court directed the parties to file simultaneous supplemental memoranda regarding the California Supreme Court's decision in *Fluor*. The Excess Insurers argued that New York has rejected a statute similar to California Insurance Code § 520, asserting that "[i]f a court were to impose the language of § 502 [*sic*] as New York law today, this would effectively overrule the expressed will of that state's political branches." Further, the Excess Insurers urged that the facts in this matter are distinguishable from those of *Fluor*. Viking and

21

excess policies contain anti-assignment provisions, which generally provide that "[a]ssignment of interest under this policy shall not bind [the insurer] until its consent is endorsed hereon."[54] The policies that do not contain such language either follow form or contain a similarly-phrased exclusion.

Because the insurance policies do not contain a governing law provision, the Court of Chancery engaged in a choice of law analysis to determine the State law that should govern. We agree with its conclusion that New York law applies, as the law of that jurisdiction had the most significant relationship to the insurance coverage as a whole.[55] The Court of Chancery then found that "Houdaille never sought or received the Excess Insurers' consent to transfer rights under the Excess Policies . . . ."[56] Neither Warren nor Viking contends that this factual finding is clearly erroneous. Instead, they assert that the insurance coverage rights were transferred after the loss triggering coverage had already taken place, rendering the anti-assignment provisions ineffective under New York law.[57]

"As a general matter, New York follows the majority rule that [a no-transfer] provision is valid with respect to transfers that were made prior to, but not after, the

---

Warren argued that *Fluor* "aligned California with the 'overwhelming majority' of American jurisdictions that authorize transfers of insurance rights for pre-assignment events." We are not persuaded by the Excess Insurers' supplemental arguments on appeal for the reasons set forth herein.

[54] *See, e.g.*, TA1123.

[55] *Viking Pump II*, 2 A.3d at 90. While Travelers argues on appeal that Florida law applies, and that the Court of Chancery erred, it states that any error would be "harmless because the laws of Florida and New York are in accord on the issues raised in this brief." Travelers Op. Br. 21 n.11.

[56] *Viking Pump II*, 2 A.3d at 103.

[57] Viking, with whom Warren joins, also contends that the anti-assignment provisions fail to defeat the transfer of insurance rights under both New York and Florida law. *See* Viking Ans. Br. 20.

22

insured-against loss has occurred."[58]  The principles underlying the majority rule are twofold.  *First*, after a loss has occurred, an assignment is not a transfer of the policy itself, but rather of a claim for policy proceeds that previously vested against the insurer and in favor of the original insured.[59]  As the United States Court of Appeals for the Second Circuit explained, "[t]he idea behind the majority rule is that, once the insured-against loss has occurred, the policy-holder essentially is transferring a cause of action rather than a particular risk profile."[60]  *Second*, when the loss occurs before the transfer of insurance coverage rights, "the characteristics of the [assignee] are of little importance: regardless of any transfer[,] the insurer still covers only the risk it evaluated when it wrote the policy."[61]  Insurers have a legitimate interest in deciding whether to allow

---

[58] *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (citing *Travelers Indem. Co. v. Israel*, 354 F.2d 488, 490 (2d Cir. 1965) ("Although assignment of the policy prior to loss [is] ineffective without the consent of the insurer, no such approval [is] necessary for an assignment of the right to the proceeds after the loss.") (alteration in *Globecon Grp.*)) (citation omitted); *see also Arrowood Indem. Co. v. Atl. Mut. Ins. Co.*, 96 A.D.3d 693, 694 (N.Y. App. Div. 2012) (same).

[59] *See* 2 COUCH ON INSURANCE § 34:25 (3d ed. 2016) ("While the general rule regards liability and indemnity policies as nonassignable personal contracts, assignment is valid following occurrence of the loss insured against and is then regarded as chose in action rather than transfer of actual policy." (citations omitted)); *id.* at § 35:8 ("Although there is some authority to the contrary, the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments of the policy, except with the consent of the insurer, apply *only* to assignments *before loss*, and do not prevent an assignment *after loss*, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising under the policy, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim." (emphasis added) (citations omitted)).

[60] *Globecon Grp.*, 434 F.3d at 171.

[61] *Id.* (quoting *N. Ins. Co. of New York v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir. 1992)); *see also* 17 WILLISTON ON CONTRACTS § 49:126 (4th ed. 2016) ("Policy provisions that require the company's consent for an assignment of rights are generally enforceable only before a loss occurs, however. As a general principle, a clause restricting assignment does not in any way limit the policyholder's power to make an assignment of the rights under the policy— consisting of the right to receive the proceeds of the policy—after a loss has occurred.  The

assignment of rights under an insurance policy, because the identity of an insured determines the extent of an insurer's risk, and an assignee may present a greater risk of loss to the insurer than the original insured. However, that interest is not impeded by the assignment of rights to claims for pre-assignment occurrences since, in such instances, the insurer is covering the risk it originally contracted to insure.

Here, at the time of assignment, the losses triggering the Excess Insurers' potential liability had already occurred within the policy periods. Warren and Viking therefore received Houdaille's accrued payment rights, which had vested in Houdaille prior to the assignments. Further, Houdaille's policies provided occurrence-based coverage, such that its claim to payment rights arose at the time of the injurious exposure to conditions that resulted in personal injury. Houdaille's insurance rights accrued once parties were injured by significant exposure to asbestos during the operative policy periods and prior to the assignments to Warren and Viking.

We do not find persuasive the Excess Insurers' argument that the anti-assignment provisions bar the transfers because "the asbestos personal-injury claims for which Viking and Warren now seek coverage were in no sense 'fixed' or 'measurable' at the time of the purported assignments because they had yet to be asserted."[62] The Excess Insurers' potential liability arose at the time of injury. That the precise amount of

---

reasoning here is that once a loss occurs, an assignment of the policyholder's rights regarding that loss in no way materially increases the risk to the insurer. After a loss occurs, the indemnity policy is no longer an executory contract of insurance. It is now a vested claim against the insurer and can be freely assigned or sold like any other chose in action or piece of property." (citations omitted)).

[62] Travelers Op. Br. 27 (citations omitted).

liability was not identifiable at the time of assignment did not alter the Excess Insurers' obligation to insure the risks for which they contracted.[63]  As they pertain to the pre-assignment, insured-against losses, therefore, the anti-assignment provisions are ineffective.[64]  Under New York law, Houdaille validly assigned the insurance coverage rights to Warren and Viking.  Accordingly, we affirm the decision of the Court of Chancery on these issues.

**B.**  ***The Superior Court Correctly Held that the 1980-1985 Liberty Primary Policies Are Exhausted***

The Superior Court held in its Final Judgment that "[t]he aggregate limits for products liability coverage of all primary and umbrella policies that [Liberty] issued to Houdaille for time periods collectively covering January 1, 1972 to January 1, 1986 are exhausted."[65]  It also held that "[t]he aggregate limits for products liability coverage of all primary and umbrella liability policies that Liberty or Travelers Indemnity Company issued to Warren Pumps, Inc. for time periods collectively covering January 1, 1966 to December 1, 1972 are exhausted."[66]  Finally, it held that, "[a]ny aggregate limits for products liability coverage of all alleged pre-1966 Liberty primary policies covering Warren are deemed exhausted by Warren's settlement with Liberty . . . ."[67]

**1. Contentions of the Parties**

---

[63] *See also Fluor*, 354 P.3d at 334.

[64] *See Globecon Grp.*, 434 F.3d at 170; *Travelers Indem. Co.*, 354 F.2d at 490; *see also Arrowood Indem. Co.*, 96 A.D.3d at 694; *see also GreenHomes Am., LLC v. Farm Family Cas. Ins. Co.*, 91 A.D.3d 1352, 1352-53 (N.Y. App. Div. 2012).

[65] Final Judgment at JA1864.

[66] Final Order at JA1864.

[67] Final Order at JA1864.  This Court has omitted reference to the amount of the settlement, which has been designated as confidential by Warren.

Liberty issued primary and umbrella-layer coverage to Houdaille from 1972 to 1985. Only the primary policies for 1980 through 1985 had deductibles. On appeal, the Excess Insurers contend that the Superior Court erred in holding that the Liberty coverage for 1980-1985 was exhausted, triggering the Excess Policies, where the Liberty policies included a $100,000 per-occurrence deductible. The Excess Insurers' appeal relates only to Liberty's primary policies for 1980 through 1985. We agree with the Superior Court that these policies have been exhausted.

The Excess Insurers do not dispute that Liberty paid the policies' full aggregate limits. Rather, they claim that Liberty failed to collect the appropriate deductibles. Central to their argument is their contention that payments made within the deductible amount do not erode Liberty's aggregate limits.[68] They argue that Viking and Warren were motivated to avoid the deductible payments since almost all of their claims have settled for under $100,000. The Excess Insurers contend that Liberty was similarly motivated to effect a premature exhaustion of the policies since Liberty's defense costs did not erode policy limits, and once Liberty's aggregate limits were reached, its obligation to pay defense costs ended.[69]

---

[68] The Excess Insurers offered an example which this Court has modified using fictional numbers to preserve as confidential the amount of the policies' aggregate limits: Assume Liberty's aggregate limit was $4,000 for a given year, and there was a $100 per-occurrence deductible. A $5,000 covered claim for a single occurrence would exhaust Liberty's $4,000 aggregate limit for a given year. But 400,000 $90 claims from separate occurrences otherwise entitled to coverage, despite adding up to $36 million, would not deplete Liberty's $4,000 aggregate limit because such payments are below the per-occurrence deductible and therefore do not, in their view, erode the aggregate limit.

[69] The parties do not dispute that defense costs do not erode the limits of the Liberty primary policies.

The Excess Insurers argue that instead of paying the deductible, Warren and Viking separately entered into multi–million dollar settlements with Liberty. The Excess Insurers disagree with Viking and Warren's contention that the deductibles were calculated and collected as part of an "adjusted premium" and argue that such a finding ignores the meaning of "deductible" under New York law. They claim that the policies' deductible language is clear and that the Superior Court erred in ruling that "whether or not the deductible was appropriately applied on an actual per-occurrence basis is beside the point[.]"[70]

Viking and Warren contend that the Superior Court correctly found that Liberty's 1980-85 primary policies are exhausted. They proffer three arguments in response to the Excess Insurers' challenges. *First*, they claim the Excess Policies are triggered when the underlying insurers pay their full policy limits. They argue that while an excess insurer is free to contest coverage under its own policy, it cannot avoid or reduce its liability by challenging the propriety of an underlying insurer's decision to pay.

*Second*, they contend that whether the primary policies had $100,000 per-occurrence deductibles is irrelevant since the deductible is part of the policy's limits, and all payments of loss erode policy limits. Thus, they argue that because it is undisputed that Liberty's indemnity payments under these policies matched the policies' total limits, it does not matter who paid the loss (as between Viking and Warren or Liberty). Under either scenario, they maintain that the payments exhausted the policies.

---

[70] *Viking Pump III*, 2013 WL 7098824, at \*20.

*Third*, they claim that the policies' plain language shows that Liberty properly calculated and collected deductibles as part of an adjusted premium. The Premium Endorsement expressly includes a "Deductible Expense" component. The Superior Court found that there was "substantial evidence" supporting the jury's finding in favor of Viking and Warren's contention that the deductible and premium adjustment provisions, when read together, provided that the Liberty deductibles were calculated and paid as part of the premium adjustment.[71]

## 2.    The Proceedings Below

In the proceedings below, the parties agreed that, "as to exhaustion, the policies [were] unambiguous and, therefore, there [was] no need for extrinsic evidence."[72]  The Deductible Endorsement, which provided for a $100,000 per-occurrence deductible, reads, in pertinent part:

> 1. [Liberty's] obligation under Coverage A - Personal Injury Liability and Coverage B - Property Damage Liability applies only to the amount of such damages and "allocated loss adjustment expense" in excess of a deductible amount of $100,000 because of all "personal injury" and "property damage" combined, as the result of any one occurrence.
>
> 2. [Liberty] shall be liable only for an amount equal to the "Personal Injury" and "Property Damage", "Each Occurrence" limit stated in the policy minus the applicable amount of deductible damages (excluding allocated loss adjustment expense) under the above Paragraph 1[;] and, subject to the foregoing, only for the difference between the "Personal Injury" or "Property Damage" aggregate limits stated in the policy and the sum of deductible damages (excluding allocated loss adjustment expenses) applicable.

---

[71] *Id.*
[72] *Id.* at *19.

3. The terms of the policy including those with respect to (a) [Liberty's] rights and duties with respect to the defense of suits and (b) the insured duties in the event of an occurrence apply irrespective of the application of the deductible amount.

. . .

5. [Liberty] may pay any part of all of the deductible amount to effect settlement of any claim or suit and, the "named insured" shall promptly reimburse [Liberty] for such part of all of the deductible amount as has been paid by [Liberty].[73]

The Excess Insurers asserted in the trial court that Liberty had "fail[ed] to properly charge and collect a deductible[,]" and that therefore, as a matter of law, Viking and Warren "could not prove that the underlying Liberty policies [had been] exhausted."[74] They contended that "Liberty's $100,000 deductible must be applied to each claim under each policy contributing to the indemnity payment, because each exposure is a separate occurrence."[75] In addition, they claimed that Liberty was "only liable for claims above the $100,000 deductible and below the $500,000 per-occurrence limit."[76] Finally, the Excess Insurers argued that the Premium Endorsement only permitted Liberty to collect a "handling fee."[77]

For their part, Viking and Warren contended that the Premium Endorsement permitted Liberty to collect a "premium for the expenses of handling deductible losses"

---

[73] Joint App'x to Warren Opening Br. JA3685 [hereinafter "JA____"]. Each 1980-1985 Liberty primary policy also includes a $500,000 "per occurrence" limit of liability and a specified "aggregate" limit of liability for "personal injury." Addendum to Excess Insurers Opening Br. A-42, -47, -54, -61, -71, -79; *see also* JA3630; JA3767; JA3923; JA4037; JA4181; JA4311.

[74] *Viking Pump III*, 2013 WL 7098824, at *19.

[75] *Id.*

[76] *Id.*

[77] *Id.*

and governed the calculation of premiums based on "deductible amounts incurred."[78] "Deductible amounts incurred" is defined in the Premium Endorsement to encompass "all losses and 'allocated loss adjustment expenses' actually paid and reserves for 'unpaid losses' and 'allocated loss adjustment expenses' as estimated by the company and which are reimbursed or to be reimbursed by the named insured [in addition to] . . . payments made directly by the named insured for all losses and 'allocated loss adjustment expense' falling within the deductible."[79]

Additionally, Viking and Warren argued that their settlements to Liberty had satisfied the deductible premium. They argued further that even if they had not paid the deductible, Liberty remained obligated to indemnify up to the policy limits and therefore would have exhausted the policies regardless. According to the plaintiffs at trial, insurers generally "reduce indemnity payments by the applicable deductible amount, eroding total limits regardless of whether a deductible is paid."[80] Plaintiffs argued that "the question of whether any portion of the amounts paid were true deductibles does not change the fact that those payments count towards the exhaustion of the policy limits, and those payments are sufficient as a matter of law to exhaust the 1980-85 Liberty primary policies."[81]

---

[78] *Id.* (internal quotation marks omitted).
[79] JA4079; *see also* JA3827.
[80] *Viking Pump III*, 2013 WL 7098824, at *19.
[81] *Id.* (internal quotation marks omitted).

At trial, plaintiffs presented testimony from Carl Brigada, Liberty's managing consultant responsible for coverage determinations.[82] Brigada had been with Liberty for 36 years. He "testified that Liberty's deductibles are based on a policy endorsement."[83] Rather than requiring payment of a deductible when each claim is made, Liberty charged the deductible in three stages—the advanced premium, the deductible premium, and the excess premium—as a way for the insured to defer premiums over time.[84] He maintained that the deductible was "nothing more than a device that's used to calculate the amount of the premium,"[85] and that deductibles had "no bearing on a policy's exhaustion."[86] He testified that Viking and Warren satisfied their deductibles for the relevant policies by way of their settlement with Liberty.

Brigada's responsibilities at Liberty also included determining whether and when exhaustion occurred on the Viking and Warren accounts. He testified that the relevant policies were exhausted after Liberty made substantial indemnity payments to all the Houdaille policies' insureds.

Theresa Carpenter, a senior claims specialist for International and Century, testified for the Excess Insurers. She "testified that Liberty's 1980-1984 and 1986 policies contained a $100,000 per-occurrence deductible, and Liberty's failure to capture

---

[82] *See, e.g.*, App'x to Viking's Ans. Br. VB60-100 [hereinafter "VB___"].
[83] *Viking Pump III*, 2013 WL 7098824, at *8.
[84] *Id.*
[85] *Id.* (internal quotation omitted).
[86] *Id.*

31

Plaintiffs' deductible payment would artificially erode the indemnity limits."[87]  Based upon her calculations, Liberty was still obligated under the Liberty Policies.

The jury rejected the Excess Insurers' contentions and found that Liberty's deductibles were "paid through the premium adjustment endorsement,"[88] and not on a per-occurrence basis.

Based on the jury verdict and its own analysis, the Superior Court ruled that the Liberty Policies were exhausted.  The Superior Court observed that paragraph 3 of the Deductible Endorsement requires that all parties thereto "fulfill their obligations under the policies, regardless of the application of the deductible amount."[89]  Additionally, "paragraph 5 permits Liberty to pay the deductible itself in order to effectuate settlements."[90]

Taking those points into consideration, the Superior Court held that "it is clear that whether or not the deductible was appropriately applied on an actual per-occurrence basis is beside the point; the policy allows the parties to continue the underlying litigation without the complicated per-occurrence deductible payments urged by [d]efendants."[91]  Further, the court held that "the deductible endorsement clearly permits Liberty to accept the deductible later, which is what the . . . settlement between Liberty and plaintiffs represented, . . . [and that] although [p]laintiffs' argument regarding the deductible as a premium calculation is not in accord with the endorsements' language, the deductible

---

[87] *Id.* at *9 (internal citations omitted).
[88] JA1480.
[89] *Viking Pump III*, 2013 WL 7098824, at *20 (internal quotation marks omitted).
[90] *Id.*
[91] *Id.*

32

endorsement nonetheless permits Liberty to cover the deductible and later seek reimbursement, presumably in the form of a premium payment."[92]  The Superior Court concluded that Liberty's decision to collect the deductible in this manner was legal and permitted under the terms of the relevant policies.[93]

The jury agreed with Warren and Viking.  The Superior Court found that "the jury had an evidentiary basis to find, as it did, that Liberty's deductibles were part of a premium plan, and that Warren and Viking satisfied any outstanding payment . . . ."[94] Because the trial court found that this aspect of the verdict was "supported by substantial evidence," it concluded that there was "no basis for overturning the jury's finding as to Liberty's exhaustion."[95]

**3.      Standard of Review**

This Court reviews the Superior Court's conclusions of law *de novo* and applies the clearly erroneous standard to findings of fact.[96]  In addition, where supported by the evidence, the verdict of a jury is conclusive.[97]

**4.      Discussion**

---

[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund of Chicago*, 75 A.3d 101, 108 (Del. 2013).
[97] *Storey v. Camper*, 401 A.2d 458, 465 (Del. 1979) (citing DEL. CONST. art. IV, § 11(1)(a) ("[O]n appeal [in civil cases] from a verdict of a jury, the findings of the jury, if supported by [the] evidence, shall be conclusive.")) (citations omitted).

We agree with Viking and Warren that the Liberty coverage for 1980-1985 was exhausted. The Excess Insurers' challenge is largely dependent upon their erroneous view that the $100,000 deductibles do not erode Liberty's aggregate limits.

The policies' Deductible Endorsements state that the policies' aggregate limits (and not just per-occurrence limits) are reduced by payments within the deductible:

> The company shall be liable only for an amount equal to the "Personal Injury" and "Property Damage", "Each Occurrence" limit stated in the policy minus the applicable amount of deductible damages (excluding allocated loss adjustment expense) under the above Paragraph 1. and, subject to the foregoing, only for the difference between the "Personal Injury" or "Property Damage" aggregate limits stated in the policy and the sum of deductible damages (excluding allocated loss adjustment expenses) applicable.[98]

Thus, whether an amount paid in settlement of a claim fell within the $100,000 deductible or not, its payment counted toward satisfaction of the aggregate policy limit. It is undisputed that Liberty paid the full aggregate policy limits of each of the policies on account of asbestos claims against Warren or Viking.[99] In fact, Liberty overpaid limits in certain instances in order to honor settlement commitments that exceeded the limits.[100] In addition, Liberty paid approximately twice that amount pursuant to its defense obligations, which did not erode limits. We agree with the parties and the trial court that

---

[98] *See, e.g.*, JA3685, ¶ 2.

[99] *See, e.g.*, JA1907-08, ¶¶ 76-77 (setting forth as an established fact for submission to the jury that "[t]he total amount of indemnity payments" documented as being made by Liberty under its umbrella and primary policies exceeded the "total aggregate policy limits for products liability claims under" those policies).

[100] VB88.

the Deductible Endorsement is unambiguous. As such, if a policy "on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract."[101]

We agree with the Superior Court that under the policies, Liberty, under paragraph 5 of the Deductible Endorsement, "may pay any part [or] all of the deductible amount to effect settlement of any claim or suit . . . ."[102] Thus, exhaustion does not depend upon who pays the deductible. Liberty settled a dispute over the deductibles with Warren and Viking, retroactively billing them for the deductibles under the 1980-85 Liberty primary policies and collecting them as part of Liberty's adjusted premiums.[103] The trial court correctly held that this provision of the Deductible Endorsement "allow[ed] the parties to continue the underlying litigation without the complicated per-occurrence deductible payments urged by [the d]efendants."[104] We agree with the Superior Court's conclusion

---

[101] *Appleby v. Chicago Title Ins. Co.*, 80 A.D.3d 546, 549 (N.Y. App. Div. 2011) (quoting *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (N.Y. 2007) (citations omitted); *see also BLGH Holdings LLC v. enXco LFG Holding, LLC,* 41 A.3d 410, 414 (Del. 2012) ("Where, as here, the plain language of a contract is unambiguous *i.e.*, fairly or reasonably susceptible to only one interpretation, we construe the contract in accordance with that plain meaning and will not resort to extrinsic evidence to determine the parties' intentions.") (citation omitted).

[102] JA3685, ¶ 5.

[103] VB65-67; VB74; VB96-100. International and Century's claims handler, Theresa Carpenter, (the sole witness for the Excess Insurers on the issue of Liberty's deductibles), agreed that Viking's payment to Liberty was sufficient under the Premium Endorsement to satisfy the deductibles for Viking's asbestos claims:

> Q. . . . The payment made that Viking and Liberty take the position was a deductible payment, you cannot sit here today and dispute that that was a sufficient amount of pay-out deductibles up to the date that the payment was made; correct?
>
> A. Up to the date that payment was made, I can't dispute that.

VB102.

[104] *Viking Pump III*, 2013 WL 7098824, at *20.

35

that "Liberty's method of collecting the deductible after-the-fact . . . was legal . . . [and that] [n]othing in the policy prevents it."[105]

Although we need not reach the issue, the Excess Insurers' construction of the Premium Endorsement as simply a tool for calculating the cost of Liberty's handling claims that fall within the per-occurrence deductibles ignores key features of the Premium Endorsement. Among these features is the "Deductible Expense" premium which is calculated using the "deductible amounts incurred," which in turn includes "payments made directly by the named insured for all losses and 'allocated loss adjustment expense' falling within the deductible."[106] If the Premium Endorsement merely dealt with calculating a premium for Liberty's handling of losses within the deductible, it would make little sense to include in the endorsement a premium related to the insured's payments within the deductible. But, even if the Excess Insurers' reading were reasonable, the jury sided with Viking and Warren, and its verdict is supported amply by Brigada's testimony.[107] The jury was entitled to credit Brigada's testimony that the settlement figure Liberty charged to Viking and Warren in 2008 satisfied any obligation owed to Liberty relating to the deductibles.

---

[105] *Id.* As the New York Court of Appeals stated in its Certification Opinion, "parties to an insurance arrangement may generally 'contract as they wish and the courts will enforce their agreements without passing on the substance of them.'" *Viking Pump V*, 52 N.E.3d at 1151 (quoting *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1081 (N.Y. 2013)).

[106] *E.g.*, JA4079.

[107] Additionally, New York courts commonly employ the *contra proferentem* rule and resolve ambiguities against the issuer. *See, e.g.*, *Tonkin v. Cal. Ins. Co. of San Francisco*, 62 N.E.2d 215, 216 (N.Y. 1945) (noting the "well settled principle 'that if a policy of insurance is written in such language as to be doubtful or uncertain in its meaning, all ambiguity must be resolved in favor of the policy holder and against the company'") (citation omitted) (quoting *Hartol Prods. Corp. v. Prudential Ins. Co. of Am.*, 47 N.E.2d 687, 690 (N.Y. 1943)).

For these reasons, we affirm the Superior Court's findings and conclusions with respect to the exhaustion of the relevant Liberty policies.

**C.** ***We Affirm in Part and Reverse in Part the Superior Court's Rulings With Respect to Defense Costs***

**1. Contentions of the Parties**

The Superior Court held that 33 of the Excess Policies at issue in this appeal provide coverage to Viking and Warren for their defense costs.[108] In deciding whether the Excess Policies provide coverage for defense costs within or in addition to policy limits, the Superior Court divided the policies into six categories, four of which we have assigned to Groups for ease of reference in this discussion: (a) true follow-form; (b) follow-form by endorsement; (c) "coverage" and "conditions" ("Group One"); (d)

---

[108] *See Viking Pump III*, 2013 WL 7098824, at *29 (holding that 32 of the Excess Policies provide for coverage of defense costs; two of these were later resolved by the parties, leaving 30 Excess Policies at issue); *Viking Pump IV*, 2014 WL 1305003, at *2-3 (acknowledging that three policies were "inadvertently omitted" from the Superior Court's Opinion in *Viking Pump III* and holding that all three of those policies "provide full defense obligations in addition to policy limits"). To summarize, the 33 Excess Policies at issue in this appeal are (1) Fidelity Policy No. SRX1889565; (2) National Union Policy No. 9601115; (3) Commercial Union Policy No. CY9502120; (4) Republic Policy No. CDE0835; (5) Vanguard Policy No. CDE1462; (6) Puritan Policy No. ML652652; (7) Aetna Policy No. 06XN243WCA; (8) Aetna Policy No. 06XN194WCA; (9) London Policy No. K25878; (10) London Policy No. 881/UHL0395; (11) London Policy No. 881/UKL0340; (12) London Policy No. 881/UKL0341; (13) London Policy No. 881/UKL0342; (14) Lexington Policy No. CE5504779; (15) Central National Policy No. CNZ141951; (16) Central National Policy No. CNZ141989; (17) Century Indemnity Policy No. CIZ425741; (18) Granite State Policy No. 62790163; (19) Old Republic Policy No. OZX11405; (20) Puritan Policy No. ML651258; (21) Lexington Policy No. GC403427; (22) Lexington Policy No. CE5503312; (23) London Policy No. CX5026; (24) London Policy No. K24961; (25) London Policy No. 881/UGL0160; (26) London Policy No. 881/UGL0162; (27) California Union Policy No. ZCX003889; (28) INA Policy No. XCP156562; (29) INA Policy No. XCP145194; (30) Lexington Policy No. 5510143; (31) International Policy No. 5220113076; (32) International Policy No. 5220282357; and (33) International Policy No. 5220489339.

"assistance" and "cooperation" ("Group Two"); (e) "assistance and cooperation [with] consent" ("Group Three"); and (f) those that define "ultimate net loss" ("Group Four").[109]

The Excess Insurers argue that the Superior Court erred for two principal reasons. *First*, the Excess Insurers contend that Liberty has no duty to defend Viking's and Warren's claims pursuant to the underlying policies. *Second*, the Excess Insurers assert that certain Excess Policies contain express defense exceptions disclaiming liability for defense costs. Specifically, the Excess Insurers urge that certain of the Excess Policies "expressly disclaim any duty to provide defense costs,"[110] "contain assistance and cooperation clauses that give the insurer the right, but not the obligation, to assume the defense,"[111] or incorporate definitions of "loss" or "ultimate net loss" that "exclude any obligation to pay defense costs."[112]

Joined by Viking, Warren responds by arguing that the Superior Court correctly concluded that all of the Excess Policies at issue in this matter provide coverage for defense costs. *First*, Warren contends that the Liberty umbrella policies cover defense costs. *Second*, Warren asserts that the Excess Policies all incorporated the obligation to cover defense costs set forth in the underlying Liberty umbrella policies.

In its appeal, Warren contends that the Superior Court erred in holding that sixteen of the Excess Policies count the payment of defense costs against their policy limits. In response, the Excess Insurers raise two principal arguments. *First*, they assert

---

[109] *See Viking Pump III*, 2013 WL 7098824, at *24-28.
[110] Excess Insurers Op. Br. 44.
[111] *Id.* at 46.
[112] *Id.* at 48.

38

that the policies do not pay defense costs at all.  *Second*, they urge that if the Excess

Policies do provide for defense costs, such payments are limited to the relevant policy

limits.

**2.      Standard of Review**

This Court reviews the Superior Court's construction and interpretation of

insurance policies *de novo*.[113]

**3.      Discussion**

i.      *Liberty Has Defense Obligations Under Its Umbrella Policies*

The Excess Insurers urge that the Superior Court erred by concluding that the

Liberty umbrella policies create defense obligations on behalf of the insurer.  They

contend that Liberty has defense obligations only for claims not covered by underlying

insurance.  Thus, the Excess Insurers argue that if Liberty has no duty to defend, the

Excess Insurers likewise have no duty to defend.  In response, Warren asserts that the

Liberty policies contain a duty to pay defense costs.

Under New York law, "[a]n insurance agreement is subject to principles of

contract interpretation."[114]   "When construing insurance policies, the language of the

'contracts must be interpreted according to common speech and consistent with the

---

[113] *Phillips Home Builders, Inc. v. Travelers Ins. Co.*, 700 A.2d 127, 129 (Del. 1997); *see also Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("The proper construction of any contract, including an insurance contract, is purely a question of law.  Accordingly, we review *de novo* for legal error the Superior Court's decision."  (internal citations omitted)).

[114] *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015).

reasonable expectation of the average insured.'"[115] A reviewing court "must construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect."[116] "New York applies 'a functional analysis to separate lines of insurance, and an insurance policy should be read in light of the role it is to play.'"[117] Further, "while ambiguities in an insurance policy are to be construed against the insurer, a contract is not ambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."[118]

The Liberty umbrella policies provide:

INVESTIGATION, DEFENSE, SETTLEMENT, ASSISTANCE AND COOPERATION

With respect to personal injury . . . *covered under this policy (or which would be covered but for the Insured's retention as stated in the declarations), but not covered under any underlying policy or any other insurance, the company will*

(1) defend any suit against the Insured seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; . . .

(2) pay all expenses incurred by the company, all costs taxed against the Insured in any suit defended by the company and all interest on the entire amount of any judgment therein . . . ;

---

[115] *Viking Pump V*, 52 N.E.3d at 1151 (quoting *Dean v. Tower Ins. Co. of N.Y.*, 979 N.E.2d 1143, 1145 (N.Y. 2012)).

[116] *Id.* (citation omitted) (internal quotation marks omitted).

[117] *Jefferson Ins. Co. of N.Y. v. Travelers Indem. Co.*, 703 N.E.2d 1221, 1226 (N.Y. 1998) (quoting *Graphic Arts Mut. Ins. Co. v. Bakers Mut. Ins. Co. of N.Y.*, 382 N.E.2d 1347, 1350 (N.Y. 1978)).

[118] *Viking Pump V*, 52 N.E.3d at 1151 (internal citations omitted) (internal quotation marks omitted) (alterations in *Viking Pump* and added).

40

* * *

(4) *pay all reasonable expenses incurred by the Insured at the company's request in assisting the company in the investigation or defense of any claim or suit . . .* ;

and the amounts so incurred, except settlement of claims and suits, are not subject to the insured's retention as stated in the declarations and are payable by the company *in addition to the applicable limit of liability* of this policy.[119]

Based upon the foregoing contractual language, the Excess Insurers assert that use of the term "covered" in the Liberty umbrella policies "should be construed as referring to whether the primary policy provides coverage and not to whether it is collectible."[120] They argue further that, "even if the primary policies were fully exhausted, the underlying asbestos claims would remain 'covered' by the primary policy so that Liberty would have no defense obligations under its umbrella policies."[121]

In construing the agreements as a whole, the first section of the Liberty umbrella policies, entitled "Coverage—Excess Liability," provides:

The company will pay on behalf of the Insured all sums in excess of the retained limit which the Insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, as damages, direct or consequential, because of: (a) personal injury . . . .[122]

The policy defines "retained limit" as follows:

"retained limit" means as to each occurrence with respect to which insurance is afforded under this policy:

---

[119] *E.g.*, JA3721-22 (emphasis added).
[120] Excess Insurers Op. Br. 43 (quoting *Am. Safety Indem. Co. v. 612 Realty LLC*, 2009 WL 2407822, at *5 (N.Y. Sup. Ct. Aug. 4, 2009)) (internal quotation marks omitted).
[121] *Id.* at 43-44 (footnote omitted).
[122] JA3721.

41

(1) if any underlying policy is also applicable or would be applicable but for breach of policy conditions; the relevant "each person", "each accident", "each occurrence" or similar limit of liability stated therein (less any reduction thereof by reason of an over-riding aggregate limit of liability) plus all amounts payable under other insurance, if any;

(2) if any underlying policy otherwise applicable is inapplicable by reason of exhaustion of an aggregate limit of liability; all amounts payable under other insurance, if any . . . .[123]

"For purpose of determining the retained limit," Section V states that "'other insurance' means any other valid and collectible insurance (except under an underlying policy) which is available to the Insured, or would be available to the Insured in the absence of this policy . . . ."[124] The definition of "retained limit" continues by observing that "the intention" of the policy is that it "shall not apply under or contribute with" such other "valid and collectible" insurance.[125]

The plain language of the Liberty umbrella policies suggests that the policies were intended to provide coverage "if any underlying policy . . . [was] inapplicable by reason of exhaustion."[126] The Liberty umbrella policies were purchased to provide coverage in

---

[123] JA3723.

[124] JA3723.

[125] JA3723. Throughout this litigation, the Excess Insurers have relied upon *Pergament Distributors, Inc. v. Old Republic Insurance Company*, 128 A.D.2d 760 (N.Y. App. Div. 1987), in support of their contention that the terms "covered" and "not covered" refer "to whether the policy insures against a certain risk[,] not whether the insured can collect on an underlying policy." *Viking Pump III*, 2013 WL 7098824, at *23 (alteration in original) (citation omitted) (internal quotation marks omitted). The Superior Court rejected the Excess Insurers' argument, reasoning that "[t]he policy discussed in *Pergament* differs, however, from the Liberty[] policies here. *Pergament* examined a policy's language to determine whether an umbrella policy must drop down to provide primary coverage where the primary carrier was insolvent. Moreover, *Pergament*, itself, is limited to the policy 'at bar,' in that case's context." *Id.* (citations omitted). On that basis, the Superior Court concluded that *Pergament* was inapposite. We agree.

[126] JA3723.

42

excess of any exhausted primary coverage. A reading of "covered" to refer to whether the primary policy provides coverage, and not whether it is collectible, distorts the actual purpose of the Liberty umbrella policies. Even assuming, *arguendo*, the terms "covered under" and "not covered" are ambiguous,[127] the jury found that that Liberty's umbrella policies maintain defense obligations.[128] The Jury Verdict Form asked the jury: "Did Plaintiffs prove that Liberty was obligated under its umbrella policies to pay defense costs for asbestos claims once the underlying Liberty primary policies were exhausted?"[129] The jury answered in the affirmative.[130] Thus, in the context of this multi-layered, comprehensive insurance coverage program, and considering the general

---

[127] The policy associates the term "cover" both with risks assumed by the insurer and with payment obligations maintained by the insured. *Compare* JA3721 ("With respect to personal injury, property damage or advertising injury or damage *covered under* this policy . . . but not *covered under* any underlying policy or any other insurance . . . .") (emphasis added), *with id.* ("which would be *covered* but for the Insured's retention") (emphasis added). But, in other instances, the policy uses the term "payable under" when referencing funds available pursuant to underlying policies or other valid and collectible insurance. For example, the policy defines "defense expenses" as follows:

> "defense expenses" means all reasonable expenses (other than the amount of any settlement) incurred by the named insured in discharging the named insured's obligations in Section II with respect to investigation, defense or settlement of claims or suits, except . . . any such expenses *payable under* an underlying policy or any other valid and collectible insurance.

JA3722 (emphasis added). Under New York law, if we were to conclude that the Liberty umbrella policies were ambiguous, that ambiguity must be resolved in favor of the insured. *Viking Pump V*, 52 N.E.3d at 1151 (quoting *Dean*, 979 N.E.2d at 1145) ("[A]mbiguities in an insurance policy are to be construed against the insurer[.]").

[128] Notably, Warren observes, and the Excess Insurers acknowledge, that Liberty has defended the asbestos claims at issue in this case. The Superior Court's ruling is consistent with Liberty's own application of the umbrella policies for more than two decades. Regardless of this extrinsic evidence, the plain language of the umbrella policies compels the conclusion that the insurer has defense obligations.

[129] JA1481.

[130] *Id.*; *see also Viking Pump III*, 2013 WL 7098824, at *24.

purpose of the Liberty umbrella policies, the reasonable expectation of the average insured would be that "covered under" concerns whether the underlying insurance is collectible.[131] We affirm the Superior Court's conclusion that Liberty has defense obligations under its umbrella policies.

ii.    *Liberty's Defense Obligations under Its Umbrella Policies Are Paid in Addition to Policy Limits*

The Liberty umbrella policies unambiguously provide that Liberty has a duty to pay defense costs in addition to policy limits. As set forth above, under "INVESTIGATION, DEFENSE, SETTLEMENT, ASSISTANCE AND COOPERATION," the umbrella policies provide that Liberty will pay defense costs and that such costs "are not subject to the insured's retention . . . and are payable by the company *in addition* to the applicable limit of liability of this policy."[132] Thus, the underlying policies require Liberty to pay defense costs in addition to the applicable policy limits. Consequently, as the Superior Court held, the Excess Policies that are truly follow form or follow form by endorsement have a corresponding duty to pay defense costs in addition to the relevant policy limits.[133]

---

[131] *See Jefferson Ins. Co. of N.Y.*, 703 N.E.2d at 1226 (quoting *Graphic Arts Mut. Ins. Co.*, 382 N.E.2d at 1350) (noting that "an insurance policy should be read in light of the role it is to play"); *Viking Pump V*, 52 N.E.3d at 1151 (quoting *Dean*, 979 N.E.2d at 1145) (stating that the language of insurance contracts must be interpreted "consistent with the reasonable expectation of the average insured").

[132] JA3721-22 (emphasis added).

[133] The Superior Court found that the Excess Policies that truly followed form and followed form by endorsement had full defense obligations in addition to the policy limits. *Viking Pump III*, 2013 WL 7098824, at *24-25. Those included the following eight policies: Fidelity Policy No. SRX1889565; National Union Policy No. 9601115; Commercial Union Policy No. CY9502120; Republic Policy No. CDE0835; Vanguard Policy No. CDE1462; Puritan Policy No. ML652652; and Aetna Policy Nos. 06XN243WCA and 06XN194WCA. Without reference to specific policy

### iii. *The Group One Policies Pay Defense Costs Within Policy Limits*

The Group One policies contain what the Superior Court referred to as "coverage" and "conditions" provisions.[134] The relevant provisions in each of the Group One policies are substantially similar to the following:

## I. COVERAGE

The Company hereby agrees, *subject to the limitations, terms and conditions hereinafter mentioned, to indemnify* the insured for all sums which the insured shall be obligated to pay by reason of the liability . . . (a) imposed upon the insured by law or (b) assumed under contract or agreement by the Named Insured . . . *for damages, direct or consequential and expenses on account of* . . . (i) Personal injuries . . . caused by or arising out of each occurrence . . . and arising out of the hazards covered by and as defined in the Underlying Umbrella Policies . . . .

## II. LIMIT OF LIABILITY – UNDERLYING LIMITS

It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . *and the Company shall then be liable to pay only the excess thereof up to a further [specified monetary sum] ultimate net loss* in all in respect of each occurrence – subject to a limit of [a specified monetary sum] in the

---

language, the Excess Insurers argue that each of these policies—excluding the Aetna policies— has no defense obligation. Excess Insurers Op. Br. 43-44 n.9. Because we conclude that Liberty maintains defense obligations under its umbrella policies, we reject this contention. *Cf.* Excess Insurers' Mem. of Law in Support of their Renewed Mot. for J. as a Matter of Law Pursuant to R. 50(b) at 25, Viking Pump, Inc. v. Century Indem. Co. (No. N10C-06-141 FSS) (Jan. 31, 2013) [hereinafter "Excess Insurers JMOL Mem. at JA____"], *available at* JA1550-95 ("A few Excess Policies do not contain defense carve-outs and therefore follow form to the Liberty umbrella policy defense obligations.") (citations omitted).

[134] *See Viking Pump III*, 2013 WL 7098824, at *25-26. The Group One policies include Central National Insurance Company of Omaha Policy Nos. CNZ141951 and CNZ141989; Century Indemnity Company Policy No. CIZ425741; First State Policy Nos. FB000022 and 929817; Granite State Policy No. 62790163; Old Republic Policy No. OZX11405; Puritan Policy No. ML651258; and Lexington Policy Nos. GC403427 and CE5503312. We conclude, however, that the analysis applicable to the Group Four policies—not the Group One policies—is applicable to Lexington Policy No. CE5503312. Further, the First State policies are not before this Court, as the disputes concerning those policies settled since the Superior Court's decision.

45

aggregate for each annual period during the currency of this Policy . . . separately in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the insured.

**CONDITIONS**

\*    \*    \*

2. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or as may be added to the Underlying Umbrella Policies . . . prior to the happening of an occurrence for which claim is made hereunder.[135]

Concluding that these policies covered defense costs, the Superior Court found that the Group One policies paid expenses subject to policy limitations, "meaning aggregate limits."[136]   The Superior Court relied principally upon the Maintenance Provision in holding that the Group One policies pay defense costs within policy limits.

Warren contends that the "amount and limits" language in the Maintenance Provisions of the Group One policies ensures only that each such policy has its own stated limits, without reference to the type (*e.g.*, "each occurrence" or "aggregate") or amount of the underlying policy limits.  Warren argues further that, even if the Group One policies did not incorporate Liberty's obligation to pay defense costs in addition to policy limits, such policies independently provide for payment of defense costs on that basis.  The Excess Insurers urge that the Group One policies pay defense costs within

---

[135] JA3746 (emphasis added).  For convenience, we refer to the "coverage" clause and similar language as the "Coverage Provision;" the "limit of liability" clause and similar language as the "Limit of Liability Provision;" and the "maintenance of underlying umbrella insurance" clause and similar language as the "Maintenance Provision."

[136] *Viking Pump III*, 2013 WL 7098824, at \*25.

46

policy limits, to the extent that such policies cover defense costs at all. Before the Superior Court, however, the Excess Insurers conceded that the Group One policies "have limited obligations to reimburse defense costs within limits for covered damages only."[137]

Under New York law, "whenever an insurer wishes to exclude certain coverage from its policy obligations, it must do so 'in clear and unmistakable' language."[138] In order to be enforced, "exclusions or exceptions from policy coverage must be specific and clear . . . ."[139] "They are not to be extended by interpretation or implication, but are to be accorded a strict and narrow construction."[140] The insurer bears the burden of "establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation."[141] Accordingly, "[i]f there is uncertainty concerning its meaning, a policy is construed to embrace coverage."[142]

We agree with the Superior Court's ultimate conclusion that the Group One policies pay within policy limits, but find instead that the more pertinent limitation is contained in the Coverage Provision of such policies. The Group One policies limit the scope of indemnification for damages and expenses, making them subject to the policy

---

[137] Excess Insurers JMOL Mem. at JA1583 (emphasis removed).

[138] *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984) (quoting *Kratzenstein v. W. Assurance Co.*, 22 N.E. 221, 223 (N.Y. 1889)) (citation omitted).

[139] *Id.*

[140] *Id.* (citations omitted).

[141] *Id.* (internal citations omitted).

[142] *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir. 1989) (citations omitted).

limits.[143]   By contrast, the Liberty umbrella policies treat damages and expenses differently.   The Liberty policies provide coverage for damages subject to limits of liability, but provide coverage for expenses in addition to the limits of liability.[144] Expenses on account of personal injuries caused by or arising out of each occurrence, under the Group One policies, are payable by the insurer, according to the Coverage Provision, "subject to the limitations, terms[,] and conditions" of the agreement.[145]   Thus, the Group One policies speak to damages and expenses in a similar manner:   Because indemnification for damages is limited to policy limits, so too are all sums payable for expenses.[146]   Accordingly, the Coverage Provision contained in the Group One policies makes clear that the parties intended that the insurer would, within the limits specified by the policy, indemnify the insured for both damages and expenses as they relate to personal injury claims.

We do not find persuasive Warren's argument that the use of the term "ultimate net loss" in the Group One policies independently requires payment of expenses in addition to the relevant policy limits.   Warren contends that "ultimate net loss" is not defined, and the policies do not otherwise state that expenses fall within "ultimate net loss."   As used in the Group One policies, the undefined term "ultimate net loss" does not create an independent duty to pay defense expenses outside the policy limits.   Rather, the Group One policies employ "ultimate net loss" to establish a limit that the insurer is

---

[143] *See, e.g.*, JA3746.
[144] *See, e.g.*, JA3722.
[145] *See, e.g.*, JA3746.
[146] *See, e.g.*, JA3746 ("damages, direct or consequential *and expenses* on account of (i) Personal injuries . . . .") (emphasis added).

obligated to pay, and such limit is inclusive of expenses. The Group One policies fail to exclude defense costs from the limit of covered ultimate net loss.

The Superior Court's conclusion that the Group One policies pay defense costs within policy limits is affirmed.

     iv.    *The Group Two Policies Pay Defense Costs Within Policy Limits*

The four London policies constituting Group Two utilize "assistance and cooperation" clauses.[147] The relevant provisions in each of the Group Two policies are substantially similar to the following:

I. COVERAGE

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for ultimate net loss which the Assured may sustain by reason of the liability imposed upon the Assured by law, or assumed by the Assured under contract for damages on account of: (a) Personal Injury Liability . . . Arising out of the hazards covered by and as defined in the Underlying Umbrella Policy issued by the Liberty Mutual Insurance Company . . . .

II. LIMIT OF LIABILITY – UNDERLYING LIMIT

It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . and the Underwriters shall then be liable to pay only the excess thereof up to a further [specified monetary sum] ultimate net loss in all respect of each occurrence – subject to a limit of [a specified monetary sum] in the aggregate for each annual period during the currency of this Policy in respect of each hazard insured with an aggregate limit in the Underlying Umbrella Policy.

CONDITIONS

1. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE

---

[147] The policies constituting Group Two include London Policy Nos. CX5026, K24961, UGL0160, and UGL0162.

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability, and except as otherwise provided herein) as are contained in or as may be added to the said Underlying Umbrella Policy prior to the happening of an occurrence for which claim is made hereunder.

\*    \*    \*

3.  <u>ASSISTANCE AND COOPERATION OF THE ASSURED</u>[148]

The Underwriters shall not be called upon to assume charge of the settlement of defense of any claim made, suit brought or proceeding instituted against the Assured but the Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Underwriters, in which event the Assured and the Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.[149]

---

[148] For convenience, we refer to the "assistance and cooperation" clause and similar language as the "Assistance Provision."

[149] *See, e.g.*, JA2395-96.  The Excess Insurers state that the Group Two policies provide as follows:  "The [insurers] shall not be called upon to assume charge of the settlement *or* defense of any claim made, suit brought or proceeding instituted against the insured . . . ."  *See* Excess Insurers Op. Br. 46 (emphasis in original and removed) (alterations in original and added). However, the Assistance Provisions incorporated in all of the Group Two policies provide that the insurers "shall not be called upon to assume charge of the settlement *of* defense of any claim made, suit brought or proceeding instituted against the Assured . . . ."  *E.g.* JA2396.  Based upon our independent review of the Excess Policies, we also observe that at least one additional policy, London Policy No. 881/UHL0395, provides that "[t]he Underwriters shall not be called upon to assume charge of the settlement *of* defense of any claim made, suit brought or proceeding instituted against the Assured . . . ."  JA3073 (emphasis added).

The Superior Court apparently assumed the word "of" should have been "or," as it quoted the relevant language as "assume charge of the settlement of [*sic*] defense . . . ."  *Viking Pump III*, 2013 WL 7098824, at \*26.  None of the briefing addressed whether the Group Two policies contain a typographical error in the phrase "settlement of defense."  Both the parties and the Superior Court have treated the Group Two policies as if they contain the phrase "settlement *or* defense," and we decline to proceed on an alternative basis in the first instance.  We sympathize with the Superior Court in its review of each of the Excess Policies in this matter—the poor quality of the reproductions and voluminous record have complicated the review process for this Court as well.

In view of the Maintenance Provisions contained in the Group Two policies, the Superior Court held that such clauses limited defense costs to within policy limits. Warren challenges this holding and relies upon its arguments asserted with respect to Group One. Warren contends that Group Two Maintenance Provisions function to ensure only that each such policy has its own stated limits and that those provisions do not alter the Excess Insurers' obligation to provide coverage for the same risks in the same manner as the underlying insurer. Warren also asserts that the Group Two policies independently provide for payment of defense costs in addition to policy limits.

The Excess Insurers raise two arguments with respect to the Group Two policies. *First*, they contend that the Group Two policies clearly disclaim coverage for defense costs.[150] *Second*, the Excess Insurers urge that the policies follow form to the underlying policies, except as regards the "amount and limits of liability."

The Group Two policies follow form to the underlying umbrella policies, maintaining both a duty to defend and a duty to pay defense expenses absent clear contradictory language. The Group Two Excess Insurers opted out of any duty to

---

[150] The Excess Insurers rely upon *In re September 11th Liability Insurance Coverage Cases*, 458 F. Supp. 2d 104 (S.D.N.Y. 2006), for the proposition that the Group Two policies disclaim coverage of defense costs. There, certain excess policies incorporated standard forms absolving them of the obligation to provide a defense, and, as discovery established, the underlying primary and umbrella carriers (to which they followed form) had refused to provide defense cost coverage in the absence of adequate loss history data. The court found that the evidence was overwhelming that Zurich (provider of the primary and umbrella policies) refused, in the absence of adequate loss history, to issue a policy that included defense cost coverage. *In re Sept. 11th Liab. Ins. Coverage Cases*, 458 F. Supp. 2d 104, 199, 121 (S.D.N.Y. 2006). We agree with the reasoning of the United States Court of Appeals for the Second Circuit in *Stonewall Insurance Company v. Asbestos Claims Management Corporation*, 73 F.3d 1178 (2d Cir. 1995), *modified on other grounds*, 85 F.3d 49 (2d Cir. 1996), and reject the notion that the Assistance Provisions in the Excess Policies "clearly disclaim coverage for defense costs." *See infra* note 151.

"assume charge" of "the settlement of defense of any claim" in the foregoing Assistance Provision.[151] Notably, the Liberty policies treat the duty to defend and the duty to pay defense expenses as being separate and distinct, addressing the duties in separate portions of the agreement.[152] Although the Excess Insurers disclaimed their duty to defend, they failed to effectively exclude the obligation to reimburse defense costs.[153]

As to whether the Group Two policies cover defense costs within policy limits, the Group Two policies provide that they cover the "ultimate net loss" relative to personal

---

[151] *See Stonewall*, 73 F.3d at 1218. In *Stonewall*, the United States Court of Appeals for the Second Circuit recognized two distinct duties: the duty to defend and a duty to reimburse defense costs. There, a portion of the policies in question provided that the insurer would have the *option* to assume charge of the defense, but would not be obligated to do so. *Id.* (setting forth policy language providing that the insurer "'may, at the sole option of the company, assume charge of the . . . defense,' . . . [but] the Company shall *not* be obligated to assume' [the] defense" (alteration in original and added) (emphasis in original)). Applying Texas law, the Second Circuit held that while language substantially similar to that of the Assistance Provisions at issue in the instant matter negates the duty to defend claims, it has no impact on the duty to reimburse the insured for the cost of defending claims covered by the insurance policy. *Id.* ("[The insured] argues that the Texas Endorsement, while negating the duty to assume defense of the Texas claims, does not in any way limit the Insurers' obligation to reimburse defense costs incurred. We agree."). *See also In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 464 n.11 (S.D.N.Y. 2005) (citations omitted).

[152] *E.g.*, JA3721-22; JA3851-52; JA3993-94; JA4108-09.

[153] *See Stonewall*, 73 F.3d at 1218. The Excess Insurers rely upon *M.H. Lipiner & Son, Inc. v. Hanover Ins. Co.*, 869 F.2d 685 (2d Cir. 1989), for the proposition that courts applying New York law when interpreting assistance and cooperation clauses have found that insurers have no duty to defend. There, the plaintiff, a jewelry business, brought a declaratory judgment action that imposed a responsibility on the insurer to defend and indemnify the company following an alleged "misdelivery" of precious stones. The United States District Court for the Southern District of New York concluded that the insurer "properly relied on a specific exclusion clause in the insurance policy" when it disclaimed "any obligation to defend or indemnify." *Id.* at 686. On appeal, the United States Court of Appeals for the Second Circuit affirmed, "agree[ing] that the insurance policy in question d[id] not provide the insurance coverage claimed" by the plaintiff. *Id.* The Second Circuit held that, "[u]nder such circumstances, an insurer is entitled to judgment declaring that it need not defend the insured." *Id.* at 688 (citing *Lionel Freedman, Inc. v. Glens Falls Ins. Co.*, 267 N.E.2d 93, 94 (N.Y. 1971) ("[I]f we can determine that no basis for recovery within the coverage of the policy is stated in the complaint, we may sustain defendant's refusal to defend.")). The exclusion of coverage in *M.H. Lipiner* distinguishes it from the facts of this case.

injury claims.[154]  The policies state that the insurers "agree, subject to the limitations, terms and conditions" of the insurance contract, "to indemnify the Assured for ultimate net loss which the Assured may sustain by reason of the liability imposed upon the Assured by law, or assumed by the Assured under contract for damages on account of . . . Personal Injury Liability . . . ."[155]  The term "ultimate net loss" is not defined in the Group Two policies.  Absent a definition of the term, "ultimate net loss" includes all sums an insurer is obligated to pay to the insured pursuant to an insurance policy, free from any deductions.  "Ultimate net loss," in the Group Two policies, is used to establish a capped limit that the insurer is obligated to pay—and such limit is inclusive of expenses within this contractual framework.  Stated otherwise, the Group Two policies do not exclude defense costs from the limit of covered ultimate net loss.[156]  The Group Two policies thus indicate that the parties intended that the insurer would, within the limits specified by the policy, indemnify the insured for expenses.  Accordingly, the Superior Court's conclusion that the Group Two policies pay defense costs within policy limits is affirmed.

v.     *The Group Three Policies Pay Defense Costs In Addition to Policy Limits, with Consent of the Insurer*

---

[154] *See, e.g.*, JA2395.

[155] *See, e.g.*, JA2395.

[156] *Compare Stonewall*, 73 F.3d at 1218 (citing *Home Ins. Co. v. Am. Home Prods. Corp.*, 902 F.2d 1111, 1113-14 (2d Cir. 1990) (holding that definition of "ultimate net loss," which was amended to delete reference to "expenses," "unambiguously include[d] only damages and not defense costs")).  In contrast to the undefined term "ultimate net loss" in the Group Two policies, the defined term "ultimate net loss" in the Group Four policies leads us to a different result. *See infra* at II.C.3.vi.

The Group Three policies utilize assistance, cooperation, and consent clauses together as an exception to their follow-form obligations, requiring the insurer's consent before the insured may obligate the insurer to provide a defense.[157] The relevant provisions in each of the Group Three policies are substantially similar to the following:

> B. NOW, this certificate is to indemnify the Insured in accordance with the applicable insuring agreements, exclusions and conditions of the primary insurance for excess loss . . . .
>
> C. The insurance afforded by this certificate shall follow that of the primary insurance except:
>
> (1) anything in this certificate or the primary insurance to the contrary notwithstanding, [the insurer] shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the Insured, but [the insurer] shall have the right and be given the opportunity to associate with the Insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve [the insurer], in which event the Insured and [the insurer] shall cooperate in all things in the defense or control of such claim, suit or proceeding, but no obligation shall be incurred on behalf of [the insurer] without its consent being first obtained . . . ; (2) the insurance afforded by this certificate shall not apply to any expenses for which insurance is provided in the primary insurance . . . .[158]

The Superior Court found that the Group Three policies follow form to the underlying Liberty policies. But it concluded that the Group Three policies do not create a duty for the Excess Insurers to "lead the defense," and that they instead enable the insurers to "affiliate" with the defense. Further, the Superior Court determined that these

---

[157] The Group Three policies include: California Union Policy No. ZCX003889; INA Policy Nos. XCP156562 and XCP145194; and Lexington Policy No. 5510143. We conclude, however, that the analysis applicable to the Group Four policies—not the Group Three policies—is applicable to Lexington Policy No. 5510143.

[158] *See, e.g.*, JA4421. For convenience, we refer to the clause requiring the insurer's consent and similar language as the "Consent Provision." We note that the Group Three policies, in contrast to the Group Two policies, use the phrase "assume charge of the settlement *or* defense . . . ."

policies do not exempt the Excess Insurers from paying "defense costs upon the primary's exhaustion. The 'associate' and 'consent' clauses are otherwise silent as to defense costs."[159] The Superior Court held that while the Group Three policies "clearly state[ that] the insurer shall not incur an obligation without its consent, and that its insurance does not cover costs provided by someone else, the policy does not 'clearly and unmistakably' exclude defense costs, especially after the primary's exhausted."[160] Nevertheless, as to the Group Three policies, the Superior Court ultimately concluded that they cover "reasonable defense costs" within the policy's applicable limits.[161]

Warren contends that the Group Three policies contain independent language that confirms the existence of a defense payment obligation and omit any language negating their follow-form defense payment obligations. The Excess Insurers respond by arguing that each of the Group Three policies "explicitly provides that it does not cover defense costs at all" and that the argument advanced by Warren is "beside the point."[162]

---

[159] *Viking Pump III*, 2013 WL 7098824, at *27.

[160] *Id.* (citing *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1282 (N.Y. 1978)) ("Well recognized is the general rule that ambiguities in an insurance policy are to be construed against the insurer, particularly when found in an exclusionary clause." (citation omitted))).

[161] *Id.* at *28.

[162] Excess Insurers Ans. Br. 49. The Excess Insurers argue that California Union Policy No. ZCX003889 "expressly disclaim[s] any duty to provide defense costs." Excess Insurers Op. Br. 44, 44 n.10. That argument is undermined by the policy's terms, which provide:

> [T]he Company shall not be obligated to assume charge of the settlement or defense of any claim or suit brought or proceeding instituted against the insured, but the Company shall have the right and be given the opportunity to associate with the insured in the defense or control of any claim, suit or proceeding which appears reasonably likely to involve the Company, in which event the insured and the Company shall cooperate in all things in the defense or control of such claim, suit or proceeding, but no obligation shall be incurred on behalf of the Company without its consent first being obtained . . . .

The Consent Provisions in the Group Three policies modify the duty to defend, making it a right or option to defend. These Excess Policies state that "no obligation shall be incurred on behalf of [the insurer] without its consent being first obtained . . . ." The Group Three policies, however, do not define the term "obligation." We believe that, under New York law, an insurer's duty to pay defense costs and its duty to defend are separate and distinct.[163] A duty requiring an insurer to pay costs, including defense costs, may properly be understood as an "obligation."[164] Ultimately, the Group Three policies fail to exclude coverage for defense costs using clear and unmistakable language, and follow form to the underlying Liberty policies.

The Group Three policies are silent with respect to whether payment of defense costs erodes policy limits. This ambiguity is to be resolved against the insurer, and the

---

JA3622. The policy provides further that "the insurance afforded by this Certificate shall [not] apply to any expenses for which insurance is provided in the [primary] insurance . . . ." *Id.* None of the foregoing policy language *expressly* disclaims the duty to pay defense costs. We also reject the Excess Insurers' contention that INA Policy Nos. XCP145194 and XCP15652 expressly disclaim any duty to pay defense costs, as those policies employ provisions functionally identical to those in California Union Policy No. ZCX003889. *See* JA4165; JA4421.

[163] *See In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. at 464 n.11 ("In contrast to a duty to pay defense costs, the duty to defend customarily includes an insurer's right to choose the attorney and control the litigation strategy." (citations omitted)). This Court has not identified—and the parties do not cite—a decision of the New York Court of Appeals making plain that the duty to defend and the duty to pay defense costs are two distinct obligations. We believe, however, that the New York Court of Appeals, like the courts of other jurisdictions, would embrace this notion. *See, e.g.*, *Stonewall*, 73 F.3d at 1218 (applying Texas law). Regardless, the Excess Policies generally follow form to the underlying Liberty umbrella policies, which policies contain distinct duties to defend and to pay costs in separately numbered paragraphs. *See, e.g.*, JA3721-22.

[164] BLACK'S LAW DICTIONARY (10th ed. 2014) ("obligation") ("1. A legal or moral duty to do or not do something. . . . 2. A formal, binding agreement or acknowledgement of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract.").

56

Group Three policies therefore incorporate the default follow-form duty to pay defense costs as reflected in the underlying policies. Consequently, the Group Three policies pay defense costs in addition to policy limits. But, as a result of the clause setting forth that "no obligation shall be incurred on behalf of [the insurer] without its consent being first obtained[,]"[165] the duties to defend and pay are made contingent upon consent.[166]

The Superior Court's conclusion that the Group Three policies have a duty to pay defense costs is affirmed, but its decision that these payments erode policy limits is reversed. Instead, we conclude that the Excess Insurers have a duty to pay defense costs, contingent upon consent, and that such costs must be paid in addition to policy limits.

vi.     *The Group Four Policies Generally Exclude Defense Costs Except Upon Written Consent of the Insurer*

Each of the Group Four policies provides that the insurer will indemnify the insured for the "ultimate net loss" resulting from personal injuries.[167] The relevant provisions in the Group Four policies are substantially similar to the following:

---

[165] *See, e.g.*, JA4421.

[166] *See Stonewall*, 73 F.3d at 1219.

[167] The Group Four policies include Lexington Policy No. CE5504779 and London Policy Nos. K25878; 881/UHL0395; 881/UKL0340; 881/UKL0341; and 881/UKL0342. As to the Coverage Provisions in the Group Four policies, each such insurance contract employs substantially identical language, with the exception of London Policy No. K25878. While the remaining Group Four policies "indemnify the Assured for ultimate net loss," London Policy No. K25878 provides that the insurer will "indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law, or assumed by the Assured under contract for damages on account of: (a) Personal Injury Liability . . . ." JA2595. The policy contains the same definitions of "ultimate net loss" and "costs" that appear in the other Group Four policies. The parties do not argue that the analysis for Policy No. K25878 should differ from that applicable to the other Group Four policies. Accordingly, we treat it within our analysis of the Group Four policies. Further, as set forth above, Lexington Policy No. CE5503312 is also included among the Group Four policies. We also separately address Lexington Policy No. CE5504779 below.

I. COVERAGE

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, *to indemnify the Assured for ultimate net loss* which the Assured may sustain by reason of the liability imposed upon the Assured by law, or assumed by the Assured under contract for damages on account of: (a) Personal Injury Liability . . . Arising out of the hazards covered by and as defined in the Underlying Umbrella Policies issued by the Liberty Mutual Insurance Company, Underwriters at Lloyd's, London, and certain Insurance Companies . . . .

II. LIMIT OF LIABILITY – UNDERLYING LIMITS

It is expressly agreed that liability shall attach to the Underwriters only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability . . . and the Underwriters shall then be liable to pay only the excess thereof up to a further [specified monetary sum] ultimate net loss in all in respect of each occurrence – subject to a limit of [a specified monetary sum] in the aggregate for each annual period during the currency of this Policy in respect of each hazard insured with an aggregate limit in the Underlying Umbrella Policies.

DEFINITIONS

1. ULTIMATE NET LOSS

The words "ultimate net loss" shall be understood to mean the amount payable in settlement of the liability of the Assured after making deductions for all recoveries and for other valid and collectible insurances, excepting however the policies of the Underlying Insurers, and *shall exclude all expenses and Costs*.

2. COSTS

The word "Costs" shall be understood to mean interest accruing after entry of judgment, investigation, adjustment and *legal expenses* (excluding, however, all office expenses of the Assured, all expenses for salaried employees of the Assured and general retainer fees for counsel normally paid by the Assured).

CONDITIONS

1. INCURRING OF COSTS

In the event of claim or claims arising which appear likely to exceed the Underlying Limit, no Costs shall be incurred by the Assured without the written consent of the Underwriters.

\* \* \*

## 3. MAINTENANCE OF UNDERLYING UMBRELLA INSURANCE

This Policy is subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and except as otherwise provided herein) as are contained in or may be added to the said Underlying Umbrella Policies prior to the happening of an occurrence for which claim is made hereunder.

\* \* \*

## 4. ASSISTANCE AND COOPERATION OF THE ASSURED

The Underwriters shall not be called upon to assume charge of the settlement of defense of any claim made, suit brought or proceeding instituted against the Assured but the Underwriters shall have the right and shall be given the opportunity to associate with the Assured or the Assured's underlying insurers, or both, in the defense and control of any claim, suit or proceeding relative to an occurrence where the claim or suit involves or appears reasonably likely to involve the Underwriters, in which event, the Assured and the Underwriters shall cooperate in all things in the defense of such claim, suit or proceeding.[168]

The Superior Court held that the Group Four policies require the Excess Insurers to pay defense costs in addition to policy limits. The Excess Insurers raise two arguments with respect to the Group Four policies. *First*, the Excess Insurers contend that the Assistance Provisions give the insurer the right, but not the obligation, to assume the

---

[168] *See, e.g.*, JA3071-73. The Assistance Provisions in the Group Four policies only eliminate the duty to defend, giving the insurer the option to join the defense of the insured. They do not exclude the duty to pay defense costs. Accordingly, we also reject any argument that the Assistance Provisions in the following policies disclaim responsibility to pay defense costs: Lexington Policy No. 5510143; California Union Policy No. ZCX003889; International Policy Nos. 5220113076, 5220282357, and 5220489339; and INA Policy Nos. XCP145194 and XCP156562. *See* Excess Insurers Op. Br. 46.

defense. *Second*, the insurers assert that the Group Four policies define "ultimate net loss" to exclude all expenses and "Costs" and that the policies define "Costs" as "interest accruing after entry of judgment, investigation, adjustment and legal expenses . . . ."

Warren urges that the Assistance Provisions do not negate the obligation to pay defense costs, and that the duty to conduct the defense is separate and apart from the duty to fund that defense. Further, Warren argues that both the jury and the Superior Court correctly held that the Excess Policies that exclude costs or expenses from the definition of "ultimate net loss" or "loss" do not negate the Excess Insurers' promise to follow form to the Liberty defense payment obligation.

The Group Four policies state that they are "subject to the same terms, definitions, exclusions and conditions (except as regards the premium, the amount and limits of liability and *except as otherwise provided herein*) as are contained in or as may be added to the said Underlying Umbrella Policies . . . ."[169] They further provide that the Excess Insurers are liable to pay only amounts in excess of the underlying insurers' ultimate net loss liability "up to a further [specified monetary sum] ultimate net loss in all in respect of each occurrence – subject to a limit of [a specified monetary sum] in the aggregate for each annual period during the currency of this Policy in respect of each hazard insured with an aggregate limit in the Underlying Umbrella Policies."[170] As previously observed, the Group Four policies define the term "ultimate net loss" to exclude expenses and "[c]osts," which, in turn, includes "interest accruing after entry of judgment,

---

[169] *See, e.g.*, JA3073 (emphasis added).
[170] *See, e.g.*, JA3071.

60

investigation, adjustment and *legal expenses* (excluding, however, all office expenses of the Assured, all expenses for salaried employees of the Assured and general retainer fees for counsel normally paid by the Assured)."[171]

The New York Court of Appeals has emphasized that when interpreting insurance policies, a reviewing court "must construe the policy in a way that affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect."[172] Read as a whole and giving effect to the Maintenance and Limit of Liability Provisions,[173] the Group Four policies use the term "ultimate net loss" to mean that the insurer is liable to the insured only for those losses that fall within the definition of "ultimate net loss."[174] And "ultimate net loss" unambiguously excludes defense costs from the insurer's indemnity obligations.[175] We conclude that these

---

[171] *See, e.g.*, JA3072 (emphasis added).

[172] *Viking Pump V*, 52 N.E.3d at 1151 (quoting *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 991 N.E.2d 666, 671-72 (N.Y. 2013)) (internal quotation marks omitted).

[173] *See Home Ins.*, 902 F.2d at 1113 ("As the plain language of the [second-level excess] policy makes clear, however, the [second-level excess] policy follows the terms of the [first-level] excess policy only to the extent that the [first-level] policy is consistent with the [second-level] policy. The [second-level excess] policy states that it is 'subject to the same warranties, terms and conditions (*except as otherwise provided herein*) as are contained in . . . the [u]nderlying [c]overage . . . ." (emphasis in original) (alterations in original and added)).

[174] *Maryland Cas. Co. v. W.R. Grace & Co.*, 1996 WL 306372, at *9 (S.D.N.Y. June 7, 1996).

[175] *Home Ins.*, 902 F.2d at 1113-14; *see also Stonewall*, 73 F.3d at 1218 ("The original insuring agreement required the insurers to indemnify [the insured's] 'ultimate net loss,' including damages and expenses that [the insured] became obligated to pay. The 'New York Amendatory Endorsement' amended the definition of 'ultimate net loss' in the insuring agreement by deleting the reference to 'expenses.' Notwithstanding [the insured's] efforts in the District Court and on appeal to rely on the legislative history of the New York Amendatory Endorsement, the District Court properly found that the term 'ultimate net loss,' as amended, unambiguously includes only damages and not defense costs." (citing *Home Ins.*, 902 F.2d at 1113-14)).
   In *Home Insurance*, the United States Court of Appeals examined policy language similar to that of the Group Four policies. There, a second-level excess insurer provided insurance for

policies exclude an obligation to pay defense costs, except upon written consent. In so holding, we give effect to the express differences in the defined term "ultimate net loss[,]" which excludes expenses and costs. These differences lead to a different outcome from policies that do not define the term "ultimate net loss."

The Group Four policies generally follow form to the underlying insurance and are silent as to whether defense costs incurred with consent of the insurer erode policy limits. This ambiguity is to be resolved against the insurers.[176] The policies pay defense costs in addition to policy limits, but only upon written consent of the insurers. The Superior Court's conclusion that the Group Four policies provide coverage for defense costs is reversed.

vii.    *The International Policies Cover Defense Costs in Addition to Policy Limits, with Consent of the Insurer*

The Excess Insurers challenge the Superior Court's ruling in its second post-trial decision regarding three Excess Policies issued by the International Insurance Company

---

"bodily injury in excess of that provided by the [first-level] excess policy, up to $11.5 million ultimate net loss. 'Ultimate net loss' [wa]s defined under the policy as 'the amount payable in settlement of the liability of [the insured] . . . *exclud*[*ing*] *all expenses and Costs*.'" *Home Ins.*, 902 F.2d at 1113 (emphasis in original) (alterations in original and added). Further, "Costs" was defined as "interest accruing after entry of judgment, investigation, adjustment and legal expenses (excluding, however, all office expenses of [the insured], all expenses for salaried employees of [the insured] and general retainer fees for counsel normally paid by [the insured])." *Id.* (internal quotation marks omitted). The Court of Appeals for the Second Circuit agreed with the insurer's "interpretation that post-judgment interest and legal expenses (in particular outside counsel fees) [we]re excluded under the plain language of the policy." *Id.* at 1114.

[176] *See Stonewall*, 73 F.3d at 1216-17 ("Stonewall's policies are silent on the consequences of cancellation, making this another ambiguity to be resolved against the insurer." (citations omitted)).

(the "International Policies").[177]   The International Policies "apply in like manner as the underlying insurance," "except with respect to . . . any obligation to investigate or defend any claim or suit[.]"[178]   The three policies also contain Assistance Provisions, which provide:

> The company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company.  In such event the insured and the company shall cooperate fully.[179]

Further, two of the policies[180] expressly contemplate the treatment of legal expenses:

> Loss and legal expenses incurred by the insured with the consent of the company in the investigation or defense of claims, including court costs and interest, shall be borne by both the company and the insured in the proportion that each party's share of loss bears to the total amount of such loss. . . .  Expenses thus paid by the company shall be paid in addition to the limit of liability . . . .[181]

The Superior Court held that the International Policies "provide full defense obligations in addition to policy limits."[182]   Two of the policies,[183] the court concluded, follow form by endorsement.[184]   The trial court observed that the third policy[185] did "not

---

[177] The three policies include International Policy Nos. 5220113076, 5220282357, and 5220489339.  The Superior Court inadvertently omitted addressing the International Policies in its October 31, 2013 decision. *See Viking Pump IV*, 2014 WL 1305003, at *2.

[178] *See, e.g.*, JA4429.

[179] *See, e.g.*, JA4429.

[180] International Policy Nos. 5220113076 and 5220282357.

[181] *See* JA4000; JA4117.  The third International Policy employs a Loss Expense Endorsement that conforms its treatment of legal expenses to the provisions in the two follow-form International Policies. *Compare* JA4000, *and* JA4117, *with* JA4433.

[182] *Viking Pump IV*, 2014 WL 1305003, at *3.

[183] International Policy Nos. 5220113076 and 5220282357.

[184] *Viking Pump IV*, 2014 WL 1305003, at *3.  The endorsements provide:  "Notwithstanding anything contained herein to the contrary, it is understood and agreed that this Insurance covers

include a follow-form endorsement,"[186] but maintained a "Loss Expense Endorsement" providing that "[l]oss expense includes . . . legal expenses incurred by the Insured with the consent of the company in the investigation or defense of claims, including court costs and interest. . . . Expenses thus paid by the company shall be paid in addition to the limit of liability . . . ."[187]

The Excess Insurers contend that the International Policies "expressly except defense payments by providing:  'except with respect to (1) any obligation to investigate or defend any claim or suit . . . the insurance afforded by this policy shall apply in like manner as the underlying insurance . . . .'"[188]  Further, the Excess Insurers assert that to the extent that the International Policies are found to be obligated to pay defense, any such obligation should be subject to aggregate limits because that is how the Superior Court adjudicated the defense obligations of the other policies containing "Assistance and Cooperation with Consent" language.[189]  Warren responds by arguing that each of the International Policies either adopts the Liberty defense obligation or sets forth an express promise to pay defense costs.

In the context of the International Policies, the Assistance Provision eliminates any obligation to "assume charge" of the defense.  The clause fails to exclude the duty to pay

the same Named Assured and is subject to the same terms, definitions, exclusions and conditions (except as regards the premium and the amount and limits of liability) as are contained in or may be added to the first layer Umbrella of the Liberty Mutual Insurance Company Policy No. To Be Advised." *See* JA4005; JA4120.
[185] International Policy No. 5220489339.
[186] *Viking Pump IV*, 2014 WL 1305003, at *3.
[187] JA4433.
[188] Excess Insurers Op. Br. 45 (emphasis removed) (citations omitted).
[189] *Id.* at 46 n.11 (citation omitted).

defense costs. But the clauses contemplating the treatment of expenses in two of the International Policies and the Loss Expense Endorsement to the third do address payment of legal expenses. These provisions contemplate the payment of defense costs contingent upon "consent of the [insurer] . . . ."[190] Thus, provided the insurer consents to the incurrence of expenses, it is obligated to pay defense costs in addition to the policy limits.

The Superior Court's conclusion that the International Policies pay defense costs in addition to policy limits is affirmed, but payment is contingent upon consent.

viii.    *Lexington Policy No. CE5504779 Generally Excludes Defense Costs, Except Those Jointly Incurred by Mutual Consent*

Pursuant to Lexington Policy No. CE5504779, the insurer "agree[d] to indemnify the insured, in accordance with the applicable insuring agreements of the Primary Insurance, against loss subject to the limits stated [in the declarations]."[191] Under Lexington Policy No. CE5504779, the term "primary insurance" means "the policy (policies) described in Item 4."[192] Item 4, in turn, states that the primary insurance is "Liberty Mutual, Policy Number To Be Agreed."[193] Further, under the insurance contract, "loss" is defined as follows:

> The word "loss" shall be understood to mean the sums paid in settlements of losses for which the insured is liable after making deductions for all other recoveries, salvages and other insurences (other than recoveries under the policy/ies of the Primary Insurer), whether recoverable or not, and *shall exclude all expense and costs.*[194]

---

[190] *See, e.g.*, JA4000.
[191] JA2906.
[192] JA2906.
[193] JA2905.
[194] JA2906 (emphasis added).

65

"Costs" is also defined by the policy:

> The word "costs" shall be understood to mean interest on judgments, investigations, adjustment and *legal expenses* (excluding, however, all expense for salaried employees and retained counsel of and all office expense of the insured).[195]

Lexington Policy No. CE5504779 also contains a section setting forth the conditions of the insurance contract. In relevant part, the conditions set forth in the policy are as follows:

> 1. It is agreed that this policy, *except as herein stated*, is subject to all conditions, agreements and limitations of and shall follow the Primary Insurance in all respects, including changes by endorsement . . . .
>
> 2. Notice of any accident, which appears likely to involve this policy, shall be given to the [insurer], which at its own option, may, but is not required to, participate in the investigation, settlement or defense of any claim or suit. *In the event expense and/or costs in connection with any claim or suit is incurred jointly by mutual consent of the [insurer] and of the Insured or Primary Insurer, the [insurer], in addition to its limits of liability as expressed in Item 6, Section 1 of the Declarations, shall be liable for no greater proportion of such expense and/or costs than the amount payable by the [insurer] under this Policy bears to the total loss payment.*[196]

Attached to Lexington Policy No. CE5504779 is a "Following Form Clause" endorsement, which provides that it "is subject to the exclusions, conditions and other terms of Policy Number to be advised issued by Lloyds [*sic*] Underwriters."[197] The endorsement continues by stating that "this insurance differs from the policy which it follows in the following particulars and any other amendments attaching to and forming

---

[195] JA2906 (emphasis added).
[196] JA2913 (emphasis added).
[197] JA2911.

part of the undermentioned policy number."[198] The Following Form Clause endorsement then provides that Lexington Policy No. CE5504779 differs from the policy to which it follows form with respect to notices of occurrences and cancellation of the policy.[199]

Lexington Policy No. CE5504779 does not, on its face, identify the specific Lloyd's policy to which it follows form. Warren urges, however, that Lexington Policy No. CE5504779 contains a "typewritten endorsement[] that conform[s]" its language to that of another Excess Policy that the Superior Court held provides coverage for defense costs.[200] Warren then asserts in a footnote that "Lexington Policy [N]o. CE5504779 and Lloyd's/London Policy [N]o. 881/UGL0160 . . . cover the same time period at the same attachment point and participate in a 'quota-sharing' arrangement pursuant to which those policies contribute stated percentages to the same covered losses."[201] The Excess Insurers do not address Warren's follow-form contentions regarding the Lloyd's policy. It does not appear to this Court, based upon the record before us, that Warren raised this argument below.[202] In any event, the argument was not addressed by the Superior Court. Thus, this Court is left with a follow-form argument that has only been obliquely raised on appeal by one party, has not been addressed by the Excess Insurers, and was not considered by the Superior Court. Under these circumstances, and given the complexities

---

[198] JA2911.

[199] JA2911.

[200] Warren Ans. Br. 49.

[201] Warren Ans. Br. 49 n.42 (citations omitted). On appeal, the sum total of the argument regarding the degree to which Lexington Policy No. CE5504779 follows form to London Policy No. 881/UGL0160 is a sentence within a footnote of Warren's Answering Brief.

[202] *See* Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.").

that arise from attempting to discern which provisions of the unspecified Lloyd's policy might apply, it would be hazardous for this Court to rule in the first instance on which Lloyd's policy is being referred to and the impact of any provision that might arguably conflict with the Lexington policy. Instead, we conclude that this issue has not been adequately raised on appeal and has been waived.

Thus, we turn to the terms of Lexington Policy No. CE5504779. The Superior Court incorporated the policy in its holding with respect to the Group Four policies. The trial court held that the policy follows form to the underlying insurance, carries full defense obligations, and pays defense costs in addition to policy limits.[203] The Excess Insurers argue that Lexington has no duty to pay defense costs under the insurance contract. They also contend that, under New York law, there is no obligation to pay defense costs when a policy excludes expenses and costs from the term "loss."

Because Lexington Policy No. CE5504779 provides indemnification for "loss subject to the limits stated [in the declarations]," the definition of "loss" "exclude[s] all expense and costs," and "costs" includes "interest on judgments, investigations, adjustment and legal expenses (excluding, however, all expense for salaried employees and retained counsel of and all office expense of the insured),"[204] we conclude that the insurer is liable to the insured only for "loss," which unambiguously excludes defense costs. Further, Lexington Policy No. CE5504779 is silent with respect to whether payment of defense costs erodes policy limits. This ambiguity is to be resolved in favor

---

[203] *Viking Pump III*, 2013 WL 7098824, at *29.
[204] JA2906.

of the insured. Thus, where expenses or costs in connection with any claim or suit are incurred jointly by mutual consent of the insurer[205] and of the insured or underlying insurer, defense costs incurred are paid in addition to policy limits. But where mutual consent of the insurer and of the insured or underlying insurer has not been obtained, Lexington Policy No. CE5504779 does not provide coverage for defense costs. The Superior Court's conclusion that Lexington Policy No. CE5504779 covers defense costs in addition to policy limits is reversed.

ix.    *Lexington Policy No. 5510143 Generally Excludes Defense Costs Except Upon Consent*

As to Lexington Policy No. 5510143, Warren argues that the Superior Court erred particularly in holding that it provides for the payment of defense costs within limits, because that policy, by endorsement, expressly follows form to another excess policy that the Superior Court held does provide for the payment of defense costs in addition to the policy limits. Warren contends that the specific policy to which the Lexington policy follows form is London Policy No. UKL0340. The Excess Insurers argue that to the extent Lexington Policy No. 5510143 follows form to London Policy No. UKL0340, it provides no defense cost coverage.

The Superior Court did not address the issue of the policy to which Lexington Policy No. 5510143 follows form.[206] London Policy No. UKL0340 is a Group Four

---

[205] *Compare Stonewall*, 73 F.3d at 1219 ("The consent provision does not require the insurer to indemnify [the insured] for defense costs unless the parties mutually agree beforehand to this arrangement.").

[206] Unlike Lexington Policy No. CE5504779, there appears to be no dispute as to the policy to which Lexington Policy No. 5510143 follows form. *See* Excess Insurers Ans. Br. 49 n.10.

policy that generally excludes defense costs except upon the written consent of the insurer. Because Lexington Policy No. 5510143 follows form to London Policy No. UKL0340 and otherwise protects against "loss" while defining "loss" to exclude all expenses and costs, this Lexington policy excludes coverage for defense costs. In the event that the insurer consents, however, the insurer must pay "expenses incurred by the [i]nsured with the approval of the [insurer]."[207] Lexington Policy No. 5510143 is silent with respect to whether payment of defense costs erodes policy limits. This ambiguity is to be resolved against the insurer, and the policy thus pays defense costs incurred by the insured with the "approval" of the insurer in addition to policy limits.

The Superior Court's conclusion that Lexington Policy No. 5510143 pays defense costs within policy limits is reversed.

### 4. Conclusion

To summarize our holding concerning defense costs, we agree with the Superior Court that Liberty has defense obligations under its umbrella policies in addition to policy limits. We also agree with the Superior Court's conclusions that the Group One and Group Two policies pay defense costs within policy limits. However, our reasoning with respect to the Group One policies differs based on the language of the policy, and we reclassify Lexington Policy No. CE5503312 within Group Four instead of Group One. In addition, we agree that the International Policies pay defense costs in addition to policy limits, although we conclude that such payments are contingent on consent. These portions of the Superior Court's decision are affirmed.

---

[207] JA3372.

70

We reverse in part the Superior Court's decision with respect to the Group Three policies. Although we agree that the Group Three policies have a duty to pay defense costs contingent on the insurer's consent, we conclude that such payments do not erode policy limits. Additionally, we reclassify Lexington Policy No. 5510143 to Group Four rather than Group Three.

Finally, the Superior Court's decisions with respect to the Group Four policies and Lexington Policy Nos. CE5504779 and 5510143 are reversed.

## D. *The Superior Court Erred With Respect to the Trigger of Coverage*

## 1. Contentions of the Parties

Warren contends that the Superior Court erred as a matter of law in paragraph 9 of the Final Judgment, which states:

> As to a person who ultimately develops lung cancer, mesothelioma or non-malignant asbestos-related disease, bodily injury first occurs, for policy purposes, upon cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage occurs during each and every period of asbestos claimant's significant exposure to asbestos. The duty to defend is based on the possibility of coverage, reflected in the pleadings' allegations. The duty to indemnify derives from whether the basis for Warren or Viking's liability to the injured claimant is actually covered by the policy.[208]

Warren contends that this language suggests that the Excess Policies are triggered not by injury during the policy period, but only by injury *during the period of significant exposure*. Warren claims that this language fundamentally alters and eviscerates the jury's verdict and effectively eliminates much of the coverage for Warren's claims.[209]

---

[208] Final Judgment at JA1868.
[209] Viking has taken no position with respect to Warren's filings on the trigger of coverage issue.

Warren claims that the Superior Court then compounded its error by denying Warren's motion for clarification and refusing to amend the Judgment to provide that all Excess Policies from the first significant exposure until diagnoses are triggered. The Superior Court justified its denials on the grounds that (i) Warren's suggested language would have been inconsistent with an "injury-in-fact" trigger; and (ii) the trial had focused solely on when injury first takes place—as opposed to how it proceeds. Warren contends that both conclusions constitute reversible error.

The Excess Insurers contend that the jury was asked to decide only one aspect of trigger, namely, whether initial cellular or molecular damage was 'bodily injury' within the meaning of the policies. The jury concluded it was. They contend that the jury did not decide whether that or any other injury continued over multiple policy periods because Warren and Viking elected not to submit that issue to the jury. The Excess Insurers maintain that Warren and Viking instead elected to address the timing and duration of injury post-trial and sought a ruling from the Superior Court that bodily injury occurred at the time of significant exposure and continued uninterrupted through disease diagnoses. The Superior Court agreed that bodily injury occurred at the time of significant exposure but twice rejected Warren's request to find that bodily injury continued through disease diagnoses. The Excess Insurers argue that the Superior Court's finding is supported by the medical testimony at trial and was not an abuse of discretion or clear error.

**2. Standard of Review**

72

The proper interpretation and construction of an insurance contract is subject to *de novo* review.[210] We will defer to the Superior Court's findings of fact "if substantial evidence supports them and they are not clearly wrong."[211]

3.    **Relevant Procedural Background**

Throughout the pre-trial proceedings, Warren urged that bodily injury occurs upon significant exposure to asbestos and continues thereafter. For example, at the September 12, 2012 Pre-Trial Conference, Warren's counsel stated that its medical expert would opine that "injury begins on the date of first exposure all the way up to [the] date of the claim."[212] Warren's proposed jury verdict form asked the jury to find that bodily injury takes place at or soon after significant exposure and "continues thereafter."[213] The Superior Court rejected this approach.

The Excess Insurers' position at trial was that bodily injury first occurred when the first malignant cell was formed. However, the Excess Insurers did not offer their own expert on the development of asbestos-related cancers, which represented the vast majority of Warren's costs. Instead, they proffered Dr. David Weill, who testified as to "the timing and mechanism of how nonmalignant disease [specifically, asbestosis] occurs in the human lungs."[214] Warren, meanwhile, maintained its position that bodily injury first occurred upon the first significant exposure to asbestos. In support of this position, Warren and Viking presented the testimony of Dr. Edward Gabrielson, who testified

---

[210] *See Phillips Home Builders*, 700 A.2d at 129 (citation omitted).
[211] *Bay City, Inc. v. Williams*, 2 A.3d 1060, 1061-62 (Del. 2010) (citations omitted).
[212] JA1094 (Tr. 20:12-14).
[213] WA579.
[214] WA518 (Tr. 51:18-22).

73

concerning the progression of the disease, beginning with cellular changes at the time of initial inhalation.[215]

At oral argument before this Court, the Excess Insurers acknowledged that, during the trial phase, they had agreed that once bodily injury (consisting, in their view, of formation of a malignant cell) commenced, it continued. Similarly, the plaintiffs' position at trial was that once bodily injury (consisting of significant exposure to asbestos) occurred, it continued thereafter. Thus, although the opposing parties had different starting points as to when bodily injury first occurred, both agreed that, as to their respective starting point, the injury continued thereafter. The parties also accepted on appeal that if a claimant had significant exposure, then there was bodily injury to which the policies would have to respond.

The jury instructions were based upon the Excess Insurers' suggested language, since the Superior Court had rejected the plaintiffs' version. These instructions told the jury that, by resolving the question of when the first injury occurred, the jury would resolve the trigger issue as a whole:

> *For an underlying claim to be covered, Plaintiffs must show by a preponderance of the evidence that the claimant suffered "bodily injury" during the policy period of an Excess Policy.*
>
> *Specifically, you must decide* whether, with respect to non-malignancy[,] asbestos-related bodily injury first occurs:
>
> 1. upon cellular or molecular damage caused by asbestos inhalation; OR
>
> 2. when the inhalation of asbestos is sufficient to overwhelm the bodies' defense mechanisms and cause fibrosis; OR

---

[215] WA390-391.

3. when the claimant's lung function is impaired.[216]

The jury instruction reflects the parties' understanding that a person who develops an asbestos-related disease suffers an injury from the time the injury process begins until the time the disease becomes manifest. The trial judge had made clear that only disputed facts were to be put to the jury. The parties' Established Facts For Submission to Jury did not include a stipulation that injury occurred after exposure through diagnosis.[217] Warren contends that it did not include any medical experts' opinions or testimony on their list of undisputed facts since it planned to have Dr. Gabrielson testify as to when the bodily injury first took place.

Over plaintiffs' objections, the Superior Court used the Excess Insurers' draft jury interrogatories as the template for the jury verdict form.[218] Plaintiffs had proposed that the jury be asked whether the plaintiffs proved that "bodily injury takes place at or soon after" significant exposure to asbestos and "continues thereafter."[219] In contrast, the Excess Insurers' proposed verdict form required the jury to select from among five choices an event constituting the "first injury."[220] No counsel, prior to the Superior Court's October 31, 2013 ruling, suggested that any disputed fact would remain unresolved under the verdict forms presented.[221] Our review of the record reveals that the

---

[216] JA1462 (emphasis added).
[217] *See* JA1892-1929.
[218] WA586-87.
[219] WA136.
[220] WA143-44.
[221] In its October 31, 2013 decision on Plaintiffs' Motion for Final Judgment and Defendants' Renewed Motion for Judgment as a Matter of Law, the Superior Court ruled that the jury's acceptance of Plaintiffs' expert's view that injury first occurs after "significant exposure" was consistent with New York law. *Viking Pump III*, 2013 WL 7098824, at *17 ("As a matter of

Excess Insurers' proposed instructions then reflected their understanding that the determination of what event "first" constituted injury would resolve the trigger issue for all Excess policies.

The jury resolved this question in the final verdict form by circling answer "a" for each of the two questions presented below:

11. With respect to a person who ultimately develops lung cancer or mesothelioma as a result of inhalation of asbestos, did the Plaintiffs prove that bodily injury first occurs (check one):

    a. upon cellular and molecular damage caused by asbestos inhalation?

    b. when the first cancer cell is created?

    c. when the cancer impairs lung function?

12. With respect to a person who ultimately develops a non-malignant asbestos-related disease as a result of inhalation of asbestos, did the Plaintiffs prove that bodily injury first occurs (check one):

    a. upon cellular and molecular damage caused by asbestos inhalation?

    b. when inhalation of asbestos fibers is sufficient to overwhelm the bodies' defense mechanisms and cause fibrosis?

    c. when the claimant's lung function is impaired?[222]

---

New York law, therefore, New York accepts dates of substantial exposure as an 'injury-in-fact' trigger."). Accordingly, it held that "[a]s a matter of law and fact, the verdict stands as to injury-in-fact." *Id.* at *18. In its June 9, 2014 letter Order, the Superior Court reiterated that "New York accepts dates of substantial exposure as an injury-in-fact trigger." Letter Order at 3, Viking Pump, Inc. v. Century Indem. Co., No. N10C-06-141 FSS (Del. Super. June 9, 2014), *available at* JA1876-79 [hereinafter "Letter/Order at JA____"]. The Excess Insurers, for purposes of this appeal, accept that significant exposure to asbestos constitutes bodily injury under New York law.

[222] JA1482-83.

In an April 16, 2014 letter to the Superior Court, Warren addressed paragraph 9 of the proposed final judgment order. Warren's proposed version of paragraph 9 was as follows:

> With respect to a person who ultimately develops lung cancer, mesothelioma or non-malignant asbestos-related disease, bodily injury first begins with cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage begins upon an asbestos claimant's first significant exposure to asbestos.[223]

In a competing letter, the Excess Insurers favored the following language:

> An Excess Policy is triggered when the underlying claimant suffered bodily injury during the period of that policy. For purposes of trigger, bodily injury first occurs upon cellular and molecular damage caused by significant exposure to asbestos that is attributable to the insured seeking coverage.[224]

Warren argued that the Excess Insurers' version did not comport with the jury's conclusion that for "claimants who develop an asbestos-related disease, bodily injury begins upon inhalation at the first significant exposure to asbestos."[225] Anticipating that the Excess Insurers would contend that the "ultimate asbestos-related disease did not develop as part of a continuous process after [the] first significant exposure[,]"[226] Warren offered two responses. First, the narrow issue identified by the parties with respect to the trigger of coverage was limited to the definition of "'bodily injury' and when a given claimant's asbestos-related injuries begin (or 'first occur')."[227] Second, Warren argued

---

[223] JA1803.
[224] JA1844.
[225] JA1805.
[226] JA1805.
[227] JA1805.

that there was never any dispute that "every asbestos-related disease results from a long-term, continuous, and uninterrupted process."[228]

The Excess Insurers objected to Warren's proposal for various reasons.[229]  First, they argued that it suggested, contrary to the jury verdict and the evidence, that "bodily injury occurs after every inhalation of asbestos."[230]  Second, they maintained that "the trial addressed (as concerns trigger) when bodily injury occurs."[231]  Further, they claimed that "[p]laintiffs bore the burden of proving that bodily injury occurs within a particular policy period, . . . [but] never sought a jury finding that bodily injury occurs continuously from inhalation until disease diagnoses, or that this period coincides with any Excess Policy[,]"[232] and the evidence at trial did not support such a finding.  The Excess Insurers argued that the plaintiffs were now seeking "to end-run around their own decision not to seek a ruling from the jury as a matter of scientific evidence and ask the Court to enter a Final Order that bodily injury occurs continuously from the date of first exposure (a 'continuous trigger')."[233]  Finally, they pointed out that the Court of Chancery had "explicitly distinguished New York's operative injury-in-fact trigger from the continuous trigger theory [p]laintiffs now advance."[234]

---

[228] JA1806.

[229] JA1844-45.  The Excess Insurers' April 16, 2014 letter objected to Warren's version for additional reasons less relevant to this dispute, including that Warren's proposal raised "for the very first time a distinction between defense and indemnity obligations related to trigger." JA1845.

[230] JA1845.

[231] JA1846.

[232] JA1846.

[233] JA1846.

[234] JA1846.

On June 9, 2014, the Superior Court entered the Final Judgment Order After Trial.[235] In a letter order dated June 9, 2014, the Superior Court deemed both of the parties' proposals "unacceptable."[236] Because "[n]either proposal accurately or completely encompasse[d] the rule of the case, and the law[,]" the Superior Court "drafted its own provision."[237] The Court explained:

> The order's "trigger" language must encompass three things: definition of injury, timing of injury, and the distinction between the duties to defend and indemnify. *Viking II* unequivocally held New York's "injury-in-fact" standard applies. The jury then determined injury first occurs "upon cellular and molecular damage caused by asbestos inhalation." The court further clarified "New York accepts dates of substantial exposure as an 'injury-in-fact' trigger." Therefore, in sum, under the policies, each substantial exposure is deemed to have caused bodily injury, defined as cellular and molecular damage.[238]

The Superior Court gave the parties leave to respond by filing a motion pursuant to Superior Court Rule 59.

Plaintiffs filed a motion under Superior Court Rule 59. In a letter dated July 11, 2014, the trial court observed that "[d]efendants' recent appeal is interlocutory" in view of the pending motion, which it "was preparing to deny . . . ."[239] It observed that "the trial focused almost exclusively on when bodily injury first occurs, rather than on the illness's course."[240] It stated further that although it "would have acknowledged the

---

[235] Final Judgment at JA1862-75.
[236] Letter/Order at JA1877.
[237] Letter/Order at JA1878.
[238] Letter/Order at JA1878 (citations omitted).
[239] Letter at 1, Viking Pump, Inc. v. Century Indem. Co., No. N10C-06-141 FSS (Del. Super. July 11, 2014), *available at* JA1880-81 [hereinafter "Letter at JA____"].
[240] Letter at JA1880. In their Answering Brief before this Court, the Excess Insurers describe this as a "comment" by the Superior Court and argue that although "Warren elevates the correctness of this comment to a 'question presented,' the statement is not a ruling and does not

similarity some courts see (and others do not), between injury-in-fact and continuous trigger in asbestos cases, [it] was unwilling to equate the terms as a matter of law at this late hour."[241]

In a Final Order dated August 14, 2014, the Superior Court denied Viking and Warren's motions for costs and closed the case.[242] It stated further that, "[i]f the parties file reargument again, the Prothonotary SHALL reject any filing."[243]

## 4.    Discussion

The parties agreed during the course of the lengthy proceedings that, under New York law, a policy is triggered if the claimant suffered some "injury in fact" during the policy period.[244] The record supports Warren's contention that this case was presented to the jury with the understanding that resolution of the issue of when bodily injury first occurred was all that was necessary because the parties agreed that bodily injury would continue until diagnoses.

Both sides' experts testified that a person who ultimately develops asbestosis has undergone a continuous process from a person's first significant exposure to asbestos that

---

present an appealable issue." Excess Insurers' Ans. Br. 36. Our review of the record suggests that the Superior Court's observation was incorrect—which perhaps explains the Excess Insurers' attempt to diminish its significance.

[241] Letter at JA1880-81.

[242] Final Order, Viking Pump, Inc. v. Century Indem. Co., No. N10C-06-141 FSS (Del. Super. Aug. 14, 2014), *available at* JA1882-88 [hereinafter "Final Order at JA____"].

[243] Final Order at JA1886 (emphasis in original).

[244] *See, e.g.*, *Stonewall*, 73 F.3d at 1194-96 (applying New York Law); *Cont'l Cas. Co. v. Rapid-Am. Corp.*, 177 A.D.2d 61, 65-66 (N.Y. 1992) (applying New York law); *Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 764-66 (2d Cir. 1984) (applying New York law).

80

continued until diagnosis.[245]  At trial, they differed only as to when bodily injury first occurs.[246]  This dispute was resolved by the jury in Warren's favor, and the Excess Insurers did not appeal that factual finding by the jury.[247]

Moreover, the Excess Insurers' position in this appeal is inconsistent with its prior positions in that, previously, they contended that the claimants did not suffer injury until each claimant suffered detectable bodily impairment—years after the excess policy periods.  On appeal, however, they contend that only those policies in place while the claimant was actually exposed to asbestos are triggered.  Graphically, Warren aptly summarizes the Excess Insurers' inconsistent positions as follows:[248]

---

[245] Dr. David Weill, for the Excess Insurers, testified regarding the disease process for non-malignant lung disease, specifically asbestosis.  WA518 (Tr. 51:17-22); WA546 (Tr. 79:15-16). He agreed that the latency period for asbestosis is generally considered to be twenty years or more from a person's first occupational exposure to asbestos through the time of clinical diagnosis of the disease.  WA527 (Tr. 60:5-10).  He agreed that individuals who have been diagnosed with clinical asbestosis have latent or subclinical phases of their disease before it causes symptoms and can be clinically diagnosed.  WA527 (Tr. 60:16-20).  He also agreed that every non-malignant asbestos-related disease, including asbestosis, begins with an inflammatory response.  WA561-62 (Tr. 94:23-95:7).

[246] Dr. Weill agreed that asbestos fibers would likely cause some cellular injury in lung tissue at the time of a claimant's first significant exposure to asbestos "[a]s long as it overwhelms the defense mechanisms."  WA533-34 (Tr. 66:23-67:5).  He testified that "damage to the lung architecture itself, that requires the persistence and the overwhelming of the lung defense mechanisms" and that "the cellular changes that are occurring don't actually damage the lung tissue until the defense mechanisms are overwhelmed."  WA534 (Tr. 66:11-17).

[247] Indeed, for twenty-three years, Liberty, the umbrella insurer, indemnified the Houdaille policies' insureds for asbestos claims under each of its policies from the claimants' first injuries until 1986.

[248] Warren Supp. Br. on Trigger Issues 7.  Thus, the Excess Insurers seek to convert the jury's finding that bodily injury first occurs upon a claimant's significant exposure to asbestos into a finding that bodily injury *only* occurred during a claimant's significant exposure to asbestos.





We agree with Warren that the Superior Court's application of an "exposure" trigger is inconsistent with New York law. We also reject the Excess Insurers' contention that Warren is essentially seeking a "continuous trigger" as opposed to New York's operative injury-in-fact trigger.[249] Plaintiffs did not rely on a presumption that asbestos-related injuries take place from exposure through manifestation. Rather, they presented to the jury expert medical testimony that the cellular and molecular damage that leads to asbestos-related disease is a continuous process that is triggered after there is an injury-in-fact, *i.e.*, the claimant's first significant exposure to asbestos. The parties acknowledged at oral argument before this Court that every asbestos claim involves a

_____

[249] *See, e.g., Stonewall*, 73 F.3d at 1195 (applying New York law) (explaining that "triggering by successive injuries, proven to have occurred," is not the same as a continuous trigger).

claimant who ultimately developed an asbestos-related disease. Both sides acknowledged that asbestos-related diseases result from gradual and continuous injurious processes. Accordingly, we conclude that the Superior Court erred, and paragraph 9 should be revised to read:

> As to a person who ultimately develops lung cancer, mesothelioma, or non-malignant asbestos-related disease, bodily injury first occurs, for policy purposes, upon cellular and molecular damage caused by asbestos inhalation, and such cellular and molecular damage occurs during each and every period of an asbestos claimant's significant exposure to asbestos *and continues thereafter*. The duty to defend is based on the possibility of coverage, reflected in the pleadings' allegations. The duty to indemnify derives from whether the basis for Warren or Viking's liability to the injured claimant is actually covered by the policy.

### III.  CONCLUSION

With respect to the issues identified in the parties' Joint Stipulation, we conclude as follows:

(i)  The Court of Chancery correctly held that there were valid assignments of insurance rights to Warren and Viking under the Excess Policies.

(ii)  The Superior Court correctly held that the 1980-1985 Liberty Primary Policies are exhausted.

(iii)  The Superior Court is affirmed in part and reversed in part with respect to its determination of the Excess Policies' coverage for defense costs.

(iv)  The Superior Court erred with respect to the trigger of coverage under the Excess Policies.